UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21 CR 345 |
| v. | Hon. John Z. Lee |
| TIMOTHY MAPES | |

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S PRETRIAL MOTIONS

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby by submits its consolidated response to defendant Timothy Mapes' pretrial motions. Dkt. 30, 31, 33.[1] The government respectfully represents as follows:

## PRELIMINARY STATEMENT

On March 31, 2021, defendant Timothy Mapes appeared before a federal grand jury. Mapes did not appear voluntarily; the government applied for and obtained a court order compelling his testimony and immunizing him from criminal liability provided he testified truthfully. During his testimony, Mapes was asked about former Speaker of the Illinois House of Representatives Michael Madigan, for whom Mapes had served as Chief of Staff for approximately 25 years. As alleged in the indictment, Mapes committed perjury and attempted to obstruct justice when he testified that he

---

[1] Because the government's filing includes responses to three motions, the government believes the filing complies with the page limitations set forth in Local Rule 7.1.

did not know what work Madigan's close friend and confidant, Michael McClain, did for Madigan between 2017 and 2019, among other matters. Dkt. 1.

Mapes has filed three pretrial motions. Dkt. 30, 31, 33. Mapes' motion to dismiss portions of Count One should be denied, because the motion concerns factual issues that should be left to the jury. As alleged in the indictment, which the Court must accept as true, Mapes' testimony was neither literally true nor the product of ambiguous questioning. Rather, Mapes' false denials of knowledge about Madigan and McClain were part of Mapes' consistent effort to lie to the grand jury. In addition, the final "whereas" clause in Count One should not be stricken from the indictment, because the indictment adequately sets forth the alleged falsehoods and the factual basis of their falsity and provides Mapes with adequate notice to prepare his defense.

Mapes' motion to strike references in the indictment to the fact that he was immunized should also be denied. The fact that the government obtained an order immunizing him and compelling him to testify is highly probative as to materiality, as it demonstrates that Mapes' truthful testimony could have assisted the government in its investigation. The admonishment Mapes received from the Chief Judge demonstrates that he understood the need to tell the truth under oath. Mapes' immunization is also relevant so that the jury understands that no rights of the defendant were infringed by compelling him to testify. In addition, the probative value of the indictment's reference to Mapes' immunization is not substantially outweighed by the danger of unfair prejudice.

Mapes' overly broad motion seeking the production of every document in the government's multi-year, wide-ranging corruption investigation that discusses Madigan, McClain, and Mapes should be denied. Although the government disputes Mapes' contention that he is entitled to the information he seeks, the government will produce all FBI interview reports that have been prepared to date. The government will not, however, agree to Mapes' overly broad request for all materials that mention Madigan, McClain, or Mapes. This information is not discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963) or *Giglio v. United States*, 405 U.S. 150 (1972). In addition, disclosure of *Giglio* and Jencks Act material three weeks before trial will give the defense sufficient time to prepare for trial.

### BACKGROUND

Timothy Mapes was Chief of Staff to former Speaker of the Illinois House of Representatives Michael Madigan for approximately 25 years, until Mapes resigned on or about June 6, 2018. Dkt. 1 ¶ 1(a)-(b).

On February 12, 2021, Mapes was served a subpoena to testify before a federal grand jury on February 24, 2021. *Id.* ¶ 1(d). The grand jury was investigating Madigan's efforts to accept and solicit bribes in connection with his role as Speaker, including with the assistance of Madigan's friend and former legislator, Michael McClain. *Id.* ¶ 4. Among other matters, the grand jury was investigating the relationship between Madigan and McClain between 2017 and 2019, including McClain's work on behalf of and at the direction of Madigan and McClain's role as

messenger for Madigan. *Id.* ¶ 1(e). On February 21, 2021, Mapes, through his defense attorney, asserted his fifth amendment privilege against self-incrimination.

On or about March 24, 2021, the Chief Judge of the United States District Court for the Northern District of Illinois entered an order immunizing Mapes pursuant to 18 U.S.C. § 6002. That order directed Mapes to testify before the grand jury and provided that no testimony or evidence provided by Mapes could be used against him other than in an instance where he lied under oath. *Id.* ¶ 5.

On or about March 31, 2021, the Chief Judge admonished Mapes that he was required to testify truthfully in the grand jury. Dkt. 1 ¶ 6. That same day, Mapes testified before the grand jury under oath. *Id.* ¶ 7. During his appearance, Mapes knowingly made numerous materially false statements, including the following testimony alleged in the indictment:

[1]      Q:    Okay. Did [McClain], after he retired, kind of give you any insight into what his interactions with [Madigan] were that you weren't privy to personally?

           A:    No, that wouldn't—that wouldn't happen.

*****

[2]      Q:    Okay. And [McClain] didn't—wouldn't tell you what he was discussing with [Madigan] or anything that he was doing on behalf of [Madigan] in that '17, '18, and '19 timeframe?

           A:    No.

*****

[3]      Q:    Do you have any knowledge about whether or not [McClain] performed any sort of tasks or assignments for [Madigan] in [the] 2017 to 2018 timeframe at all?

4

A.     I don't recall any.

                              *****

[4]    Q:     . . . Do you have any reason to think [McClain] was acting as an
              agent for [Madigan] after he retired in 2016, that is, doing work
              for him or carrying out assignments for him?

       A:     I'm not aware of any. I'm not aware of that activity. Let's put it
              that way.

                              *****

[5]    Q:     . . . [A]ll these questions are going to be for the 2017 through 2019
              timeframe.

              Do you recall anyone ever describing any work—anyone at all
              describing any work or assignments [McClain] was performing on
              [Madigan's] behalf?

       A:     I don't recall that—that I would have been part of any of that
              dialogue. I don't know why I would be.

       Q:     The answer is yes or no to that question. Do you recall?

       A:     No, I don't recall any of that.

                              *****

[6]    Q:     . . . So one of the things we were trying to figure out, Mr. Mapes,
              is whether or not—kind of a key issue for us is whether or not
              [McClain] acted as an agent for [Madigan] in any respect,
              including that timeframe. We're talking about the 2017, 2018,
              2019 timeframe. Are you aware of any facts that would help us
              understand whether or not, in fact, [McClain] acted as an agent
              or performed work for [Madigan] or took direction from [Madigan]
              in that timeframe?

       A:     I don't know who you would go to other than [Madigan] and
              [McClain]. [Madigan], if he had people do things for him like I did
              things for him, was—didn't distribute information freely.

                              *****

[7]    Q:     Let's talk about 2017/2018 to the present, do you know [McClain]

                               5

to have acted in any capacity as a messenger for [Madigan] to convey messages to and from him?

A:     I'm not aware of any.

Dkt. 1 ¶ 8.[2]

Contrary to his false testimony before the grand jury, Mapes was very familiar with McClain's relationship with Madigan. Indeed, the evidence the government intends to introduce at trial (which will include, but not be limited to, wiretap conversations between Mapes and McClain) will demonstrate that Mapes and McClain discussed in great detail, among other things, McClain's interactions with Madigan as well as the assignments and work that McClain performed on Madigan's behalf.

On May 26, 2021, the same grand jury that heard Mapes' testimony returned an indictment against him, which charged him with one count of perjury in violation of 18 U.S.C. § 1623(a), and one count of attempted obstruction of justice in violation of 18 U.S.C. § 1512(c)(2). Dkt. 1.

## ARGUMENT

I.     **Defendant's Motion to Dismiss Portions of Count One (Dkt. 33) Should Be Denied.**

Mapes moves to dismiss portions of Count One, claiming that he misunderstood certain questions he claims were ambiguous, such as questions concerning whether McClain acted as Madigan's agent or performed assignments for Madigan. Mapes also claims that certain of his responses that he did not recall

---

[2] The transcript of Mapes' grand jury testimony is filed under seal as Government Exhibit 1.

whether McClain performed work for Madigan were literally true. Dkt. 33. For the reasons that follow, the motion should be denied.

### A.    Applicable Law

An indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment complies with Rule 7 and the Constitution if it (1) states the elements of the crimes charged; (2) adequately informs a defendant of the nature of the charges brought against him; and (3) enables the defendant to assert the judgment as a bar to future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013); *United States v. Serola*, 767 F.2d 364, 369 (7th Cir. 1985).

"Facial sufficiency is not a high hurdle"; there is no need for an indictment to "exhaustively describe the facts surrounding a crime's commission." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd*, 522 U.S. 23 (1997). An indictment that tracks the words of a statute to state the elements of the crime generally is acceptable, so long as the indictment states sufficient facts to place a defendant on notice of the specific conduct at issue. *Vaughn*, 722 F.3d at 925.

When considering a motion to dismiss under Rule 12(b), a court assumes all facts in the indictment to be true and "view[s] all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *see also United States v. Moore*, 563 F.3d 585, 586 (7th Cir. 2009). The court evaluates the allegations "on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (quotation omitted).

A motion to dismiss an indictment is not a summary-judgment motion and should not be used to test the strength or weakness of the government's case, or the sufficiency of the government's evidence. *Moore*, 563 F.3d at 586 (citation omitted); *see also United States v. White*, 610 F.3d 956, 959 (7th Cir. 2010) (courts "do not consider whether any of the [indictment's] charges have been established by evidence, or whether the Government can ultimately prove its case"). Where a pretrial motion is substantially intertwined with the evidence of the alleged offense, the motion to dismiss should be denied. For example, in *United States v. Yasak*, 884 F.2d 996 (7th Cir. 1989), the Seventh Circuit affirmed the denial of a motion to dismiss a perjury count, because the question whether the defendant's answers were literally true was "a question for the jury." *Id.* at 1001; *see also id.* at n.3 (questioning whether a literal truth defense "was even a proper matter for pretrial resolution under Fed. R. Crim. P. 12(b), given the fact that it involved a jury question on the ultimate issue of guilt or innocence—whether [the defendant] lied to the grand jury").

Title 18, United States Code, Section 1623(a) provides that "[w]hoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration" commits perjury. To prevail on the perjury count, the government must prove that: (1) Mapes, while under oath, testified falsely before a United States grand jury; (2) Mapes' testimony concerned a material matter; and (3) Mapes knew the testimony was false. Seventh Circuit Pattern Instructions (2020 ed.) at 659.

The perjury statute is "aimed primarily at allowing the government to press an inquiry into wrongdoing free from the self-interest of those witnesses who hide the truth behind a curtain of vexing lies." *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986) (citations omitted). The Supreme Court, in *United States v. Mandujano*, 425 U.S. 564, 576 (1976), framed the need to hold perjurers accountable as follows:

> Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative. The power of subpoena, broad as it is, and the power of contempt for refusing to answer, drastic as that is and even the solemnity of the oath cannot insure truthful answers. Hence, Congress has made the giving of false answers a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it.

Despite this compelling interest in holding perjurers accountable, there are limits on what constitutes perjury. "[A] perjury conviction which might have been based on questions that were ambiguous or on responses that were literally truthful may not be sustained." *Lighte*, 782 F.2d at 369; *see also Bronston v. United States*, 409 U.S. 352, 362 (1973). The literal truth defense is a "narrow one . . . [that] applies only where a defendant's allegedly false statements were *undisputedly* literally true." *United States v. Sarwari*, 669 F.3d 401, 406 (4th Cir. 2012) (internal citations and quotations omitted). A literal truthfulness defense is ordinarily left to the jury, absent a finding that the prosecutor's questions were fundamentally ambiguous as a matter of law. *Lighte*, 782 F.2d at 374-75.

Like the literal truth defense, ambiguity also is ordinarily left to the jury. *See United States v. Martellano*, 675 F.2d 940, 944-46 (7th Cir. 1982) (reversing perjury verdict based on a single allegedly false statement, based on plural question posed by the prosecutor); *see also United States v. Hird*, 913 F.3d 332, 346 (3d Cir. 2019) ("Challenges to the clarity of a question are typically left to the jury . . ."). "A question is fundamentally ambiguous in narrow circumstances." *United States v. Strohm*, 671 F.3d 1173, 1179 (10th Cir. 2011). A question is "fundamentally ambiguous" when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Lighte*, 782 F.2d at 375. "A defendant may not succeed on a claim of fundamental ambiguity by isolating a question from its context in an attempt to give it a meaning entirely different from that which it has when considered in light of the testimony as a whole." *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998).

## B. Analysis

During Mapes' testimony, the prosecutor asked more than a dozen questions about what Mapes knew about Madigan's and McClain's relationship from 2017 to 2019. *E.g.,* Gov. Exh. 1 at 65, 67, 69, 70, 71, 73, 74, 77, 78, 102-03, 115-16, 120-121. Mapes lied in response to each question. When considered in context, and as discussed in further detail below, Mapes' repeated false statements were not the product of any ambiguity, and the indictment properly alleges they were knowingly false. *See, e.g., Hird*, 913 F.3d at 348 (affirming perjury conviction where prosecutor's

questions had an "an obvious, consistent focus," and the "broader context" would permit the jury to conclude the defendant understood the questions).

### 1.    Specification 4

Before substantive questioning of Mapes began, Mapes testified that he had the assistance of two attorneys in connection with his testimony, and that he understood that a break in his testimony would occur at his request in the event he needed to consult with them. *See* Gov. Exh. 1 at 7.[3] Moreover, Mapes agreed that he would let the prosecutor know if he didn't understand a question, or if a question was unclear.  *Id.* Further, Mapes agreed that if he did not let the prosecutor know that he did not understand a question, everyone would assume that Mapes understood the question that was asked. *Id.* at 8.

As to the fourth statement specified in the perjury charge, the government asked Mapes if he had "any reason to think [McClain] was acting as an agent for [Madigan] after he retired in 2016, that is, doing work for him or carrying out assignments for him." Dkt. 1 ¶ 8. Mapes claims this question was ambiguous (Dkt. 33 at 6-7), even though (1) Mapes said nothing at the time to indicate he did not understand the question and responded to it; and (2) the prosecutor expressly defined the term "agent" ("doing work . . . or carrying out assignments for him"). Specifically, Mapes responded, "I'm not aware of any. I'm not aware of that activity. Let's put it

---

[3] Indeed, Mapes asked for and was afforded a break during his testimony, Gov. Exh. 1 at 58-60, and Mapes also had a break for lunch. *Id.* at 94-96. Mapes' false testimony in specifications 1, 3, 4, and 7 all occurred before the lunch break. Gov. Exh. 1 at 69, 73, 78. After the lunch break, Mapes was asked if there were any corrections that he wanted to make to his testimony, and he declined to do so. *Id.* at 96.

that way." Dkt. 1 ¶ 8. Mapes' statement that "I'm not aware of *that activity*," demonstrates that he knew the question concerned "activity" by McClain on behalf of Madigan. The indictment thus adequately alleges that Mapes' response in specification 4 was knowingly false. *See Strohm,* 671 F.3d at 1178 ("Simply plumbing a question for *post hoc* ambiguity will not defeat a perjury conviction where the evidence demonstrates the defendant understood the question in context and gave a knowingly false answer."); *United States v. Long*, 534 F.2d 1097, 1100 (3d Cir. 1976) (district court erred in dismissing perjury counts, where use of terms "bribery" and "kickback" were common enough that defendant would have known what they meant, and "[a]t no time in the course of their testimony, did [defendants] manifest the slightest uncertainty or confusion as to the meaning of these terms").

The context of Mapes' testimony is also relevant. *See United States v. DeZarn*, 157 F.3d 1042, 1048-50 (6th Cir. 1998) (stating that "the question and answer must be examined in the context of the investigation as a whole and the state of the defendant's knowledge in order to determine whether ambiguity exists," and examining news reports the defendant had admitted to reading). As noted above, the subject of whether McClain acted on Madigan's behalf was asked on numerous occasions and in numerous different ways. Moreover, the defendant appeared only after admitting that he had several weeks to meet with his attorneys to prepare for his testimony. This, and other evidence, will show that the defendant knew exactly what the prosecutor was asking, and nevertheless decided to lie.

Mapes' argument is similar to the defense argument rejected by the Fifth Circuit in *United States v. Brown*, 459 F.3d 509 (5th Cir. 2006). In *Brown*, the Fifth Circuit affirmed the defendant's perjury conviction and rejected his claim that the questions posed to him were ambiguous. The court noted that there was no indication that the defendant struggled to understand or that the defendant misunderstood the questions. Instead, the defendant's answers were "carefully responsive," to the questions posed, which demonstrated that the defendant was "keenly aware of the thrust of the prosecutor's questions." *Id*. at 529.

Here too, Mapes carefully attempted to dodge straightforward questions about Madigan and McClain, two men with whom he had a close personal relationship for decades. Mapes' testimony in specification 4 was part of a theme during his two-hour testimony: Mapes falsely claimed to know nothing about McClain's work for Madigan, when in fact Mapes and McClain discussed McClain's work for Madigan at length in 2017 and 2018. Dkt. 1 ¶¶ 2-3, 8. Mapes' response was not a false answer given out of inadvertence (*e.g., Martellano*, 675 F.2d at 942), but a calculated effort to mislead the grand jury.

### 2. Specification 6

As to the sixth statement specified in the perjury charge, the prosecutor explained the focus of the investigation, stating: "a key issue for us is whether or not [McClain] acted as an agent for [Madigan] in any respect" from 2017 to 2019. Dkt. 1 ¶ 8. The prosecutor then asked: "Are you aware of any facts that would help us understand whether or not, in fact, [McClain] acted as an agent or performed work for [Madigan] or took direction from [Madigan] in that timeframe?" Mapes responded,

"I don't know who you would go to other than [Madigan] and [McClain]. [Madigan], if he had people do things for him like I did things for him, was—didn't distribute information freely." *Id*. Mapes' response that one could ask McClain or Madigan showed that he understood the question. And as alleged in the indictment, Mapes' claim that only Madigan and McClain had knowledge about McClain's work for Madigan was a lie; Mapes had that knowledge as well, because he frequently spoke to McClain about tasks McClain was performing for Madigan. *E.g., id*. ¶¶ 2, 3.

A defendant's knowingly false testimony that he does not know or recall a fact can form the basis of a perjury prosecution. In *United States v. Devitt*, 499 F.2d 135, 137 (7th Cir. 1975), for example, the defendant, a Chicago police officer, testified before the grand jury that he had no knowledge of or could not recall any instance in which he had accepted money from any tavern owner while performing his official duties. At trial, tavern owners testified about money paid to the defendant. The court found that the jury could conclude, contrary to the defendant's testimony at trial, that the defendant accepted money from them and remembered doing so. *Id*. at 140. Like the defendant in *Deavitt*, Mapes' claims that he was not aware of McClain's work for Madigan were false. Indeed, Mapes was specifically advised during his testimony that "if you answer a question saying you don't have recall or don't remember something and the Grand Jurors sitting in this room conclude that you're lying about failing to remember something, [ ] you can [be] prosecuted for perjury." Gov. Exh. 1 at 131-32.

Mapes claims the prosecutor should have asked certain follow-up questions. Dkt. 33 at 8. But Mapes *was* asked about the same topic many times in different

ways, all calculated to elicit information concerning McClain's relationship with Madigan and work that McClain performed for Madigan. Dkt. 1 ¶ 8. Over and over, Mapes testified that he did not know or recall anything about Madigan's and McClain's relationship, even though McClain had described to Mapes at length the work he did for Madigan. By failing to provide truthful responses to the most basic questions about what he knew about Madigan's and McClain's relationship, Mapes foreclosed any meaningful opportunity for follow-up. *See United States v. Bryan*, 58 F.3d 933, 960 (4th Cir. 1995) (government's repeated inquiries provided sufficient notice to the defendant of the broader focus of the questioning), *abrogated on other grounds, United States v. O'Hagan,* 521 U.S. 642 (1997).[4]

Mapes' claim that he misunderstood the question relating to specification 6 is not only belied by clear, consistent questioning, but also by the context. Mapes had agreed to inform the prosecutor if he did not understand a question and also admitted that he knew about the government's widely publicized investigation of Madigan and McClain. Gov. Exh. 1 at 8, 34, 65, 144.[5] Considering this context, Mapes' responses and his statement that discussions with Madigan were "private between him and the

---

[4] For example, Mapes was asked whether he had any interactions with McClain in 2017 and 2018 other than assisting with downstate Democratic candidates. Mapes responded, "I don't recall any today. He – he could have been around the legislature, but I don't recall him being around much then." Gov. Exh. 1 at 67-68. When asked whether it would surprise him if Madigan and McClain remained in contact, Mapes testified that it would not. But when asked in follow-up if he had any knowledge of what McClain and Madigan might have been talking about in that period, Mapes claimed not to recall anything. *Id.* at 69.

[5] Mapes' responses thus differ from those considered by the Third Circuit in *United States v. Serafini*, 167 F.3d 812, 824 (3d Cir. 1999). There, the court affirmed the dismissal of a perjury count that related to a broad, open-ended, and imprecise question that the defendant clearly misunderstood based on his response.

other person in the room" were part of a deliberate effort to dissemble. *See Yasak*, 884 F.2d at 1002 (examining "the entire colloquy" in perjury prosecution, and concluding that "the government's questions could be reasonably understood and answered"); *Lighte*, 782 F.2d at 373 ("In determining the meaning a declarant gives to a question, a jury need not examine isolated segments of the question and answer exchange, but may view it within the context of the entire line of questioning.").

### 3.   Specifications 3 and 5

Mapes' contention that the third and fifth statements specified in the perjury charge were truthful should similarly be left to the jury to decide. *See Lighte*, 782 F.2d at 374-75.

As to the third specification, the prosecutor asked if Mapes had "any knowledge about whether or not [McClain] performed any sort of tasks or assignments for [Madigan] in [the] 2017 to 2018 timeframe at all?" Dkt. 1 ¶ 8. Mapes did not indicate the question was unclear, and his response was clear and unequivocal: "I don't recall any." *Id.* Similarly, as to the fifth specification, the prosecutor asked if Mapes recalled "anyone at all describing any work or assignments [McClain] was performing on [Madigan's] behalf" from 2017 to 2019. Dkt. 1 ¶ 8. Mapes responded: "I don't recall that—that I would have been part of any of that dialogue. I don't know why I would be." *Id.* When pressed to give a responsive answer, Mapes then said "No, I don't recall any of that." *Id.*

Mapes did not ask the prosecutor to rephrase the question, which demonstrates that he knew what the common terms "work" and "task" and "assignments" meant. Mapes' statements that he did not recall work McClain

16

performed for Madigan between 2017 to 2019 was a lie, as discussed above. Mapes claims that the "government has thus far offered no evidence in discovery to contravene the literal truth" of his statements. Dkt. 33 at 10. Of course, the government is not required to present evidence in response to a motion to dismiss. *White*, 610 F.3d at 959 (courts "do not consider whether any of the [indictment's] charges have been established by evidence, or whether the Government can ultimately prove its case").

Nor is a prosecutor required to ask follow-up questions, refresh someone's recollection, or disclose sensitive aspects of the government's investigation to secure truthful testimony. *See United States v. D'Auria*, 672 F.2d 1085, 1093 (2d Cir.1982) ("There is no requirement that the government reveal to a perjurer that it has evidence of the untruthfulness of his statements, much less that it reveal evidence to a witness whom it believes to have committed perjury."). A jury could easily interpret Mapes' testimony that "something could come up . . . if you bring it up and it pops my memory" as gamesmanship (Gov. Exh. 1 at 69), that is, an effort to ascertain what evidence the government had, in order to tailor his testimony accordingly.

Mapes concedes, based on wiretap recordings produced in discovery, that he had multiple conversations with McClain about McClain's work for Madigan. Dkt. 33 at 11. From these recordings, the jury will have ample evidence to find that Mapes knew McClain was working for Madigan. In fact, McClain even confided in Mapes that McClain had taken over certain of Mapes' tasks after Mapes resigned in 2018.[6]

---

[6] Mapes' suggestion that the government will be required to call a witness who spoke to Mapes immediately before or after his testimony is incorrect. *See United States v. Chapin*,

This case is therefore similar to *United States v. Niemiec*, 611 F.2d 1207, 1211-12 (7th Cir. 1980). There, a defendant was convicted of perjury, after testifying in the grand jury that he was not aware that a bail bondsman had paid police officers to refer arrestees to him. The evidence at trial included a taped conversation between the bail bondsman and the defendant in which they discussed the payments. The Seventh Circuit affirmed the perjury conviction, because the recordings and other evidence demonstrated defendant's direct knowledge of the payoffs.

Mapes' effort to characterize his repeated lies as "testimonial mishap[s]" is similarly misplaced. Dkt. 33 at 10. He answered what was essentially the same question more than a dozen different times with some version of "I don't know" or "I don't recall" or "I wouldn't be privy to that." Mapes' consistent, false answers, despite ample opportunity to ask for clarification, demonstrate that his responses were not the result of any misunderstanding.

### 4. The Indictment Adequately Sets Forth Mapes' Alleged Falsehoods and the Basis for their Falsity

A perjury indictment must adequately set forth the falsehoods alleged and the factual basis of their falsity with sufficient clarity to permit a jury to determine their verity and to allow meaningful judicial review. *See Serola*, 767 F.2d at 369-70 (perjury indictment is sufficient if it "contains clear, direct, unambiguous and precise

---

515 F.2d 1274, 1280-81 (D.C. Cir. 1975) ("[P]erjury cases, like all criminal cases, are susceptible to proof by circumstantial evidence, and in fact are peculiarly likely to be proven in this manner because one of the elements of the crime is that the defendant knew his statement was false when he made it."); *Lighte*, 782 F.2d at 373 ("circumstantial evidence, including proof of a motive to falsify, often may serve to convince a reasonable juror beyond a reasonable doubt of a witness' criminal intent.").

questions and answers that the nature and extent of the alleged falsity is fairly self-evident").

Mapes argues that the indictment does not provide factual support for the final whereas clause (Dkt. 33 at 12), which provides that "in truth and fact . . . MAPES provided [McClain] with messages communicated to MAPES by [Madigan], including messages concerning work and assignments [McClain] was performing on behalf of [Madigan] between 2017 and 2018." Contrary to defendant's contention, the "whereas" clause is connected to the false statements alleged in the indictment. Specifically, the indictment alleges that in 2017 and 2018, while he was Chief of Staff, Mapes communicated messages to McClain from Madigan, and McClain communicated messages to Mapes for use by Madigan. Dkt. 1 at ¶ 2. Based on these allegations, which the Court must accept as true for purposes of Mapes' motion to dismiss, Mapes committed perjury when he testified that he did not know about McClain's and Madigan's interactions; that he did not recall whether McClain performed assignments for Madigan; and that he was not aware whether McClain acted as Madigan's agent. *Id.* at ¶ 8. Given the indictment's allegations that Mapes not only knew of McClain's role, but gave instructions to McClain on Madigan's behalf, there is ample basis from which a jury can find that Mapes knew McClain worked for Madigan.

The indictment adequately sets forth the alleged falsehoods and the factual basis of their falsity and provides Mapes with adequate notice to prepare his defense.

## II.     Defendant's Motion to Strike (Dkt. 30) Should Be Denied.

Mapes also moves to strike references in the indictment to the fact that he was immunized, claiming that the references are irrelevant and unfairly prejudicial. Mapes' motion should be denied, because Mapes' immunization is highly probative and the probative value is not substantially outweighed by the danger of unfair prejudice.

### A.     Applicable Law

It is within a court's discretion to strike immaterial or irrelevant allegations in an indictment as surplusage. *United States v. Climatemp, Inc.*, 482 F. Supp. 376, 391 (N.D. Ill. 1979), *aff'd sub nom.*, *United States v. Reliable Sheet Metal Works, Inc.*, 705 F.2d 461 (7th Cir.), *cert. denied*, 462 U.S. 1134 (1983). Such a motion is governed by Federal Rule of Criminal Procedure 7(d), which serves as a "means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may [ ] be prejudicial." Fed. R. Crim. P. 7(d), Advisory Committee Note. But a court may strike allegations from an indictment "only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial." *United States v. Andrews*, 749 F. Supp. 1517, 1518-19 (N.D. Ill. 1990); *see also United States v. Peters*, 435 F.3d 746, 753 (7th Cir. 2006). This standard is an exacting one, which is only rarely met. *See And]rews*, 749 F. Supp. 1517; *United States v. Chaverra-Cardona*, 667 F. Supp. 609, 611 (N.D. Ill. 1987).

## B. Analysis

The indictment's references to Mapes' immunization are plainly relevant when considered in the context of the government's allegation that Mapes knowingly lied to the grand jury and attempted to obstruct justice.

In a perjury prosecution, the government must present evidence of "the full context of the Defendant's activities as well as other information of which he may have had knowledge and which may have influenced him." *DeZarn*, 157 F.3d at 1049. Before he appeared before the grand jury, Mapes was personally admonished by the Chief Judge of the scope of his testimony, that he was required to answer all questions, and that his truthful testimony was required by the immunity order. The fact that Mapes was immunized and admonished by the Chief Judge is relevant to materiality, because it underscored the importance of Mapes' truthful testimony. "[W]hen granted immunity, a witness . . . owes the obligation imposed upon all citizens the duty to give testimony since immunity substitutes for the privilege." *United States v. Mandujano*, 425 U.S. 564, 576 (1976). Put differently, when testimony is secured by statutory immunity, as it was in Mapes' case, the imperative to tell the truth is that much stronger. Mapes' refusal to tell the truth even in the face of the statutory protection that he was afforded demonstrates that his testimony was part of a calculated effort to lie.

Moreover, the fact that the government sought an order compelling Mapes to testify under statutory immunity demonstrates that Mapes' testimony could have assisted the government in its investigation, had he testified truthfully. The immunity order is thus highly probative as to materiality. *See United States v.*

*McComb*, 744 F.2d 555, 563 (7th Cir. 1984) (government must prove that testimony is capable of impeding, interfering with or influencing the grand jury).[7]

The immunity order is also relevant because it tends to show that Mapes was not caught by surprise in the grand jury. The immunity order and admonishment by the Chief Judge were two steps in a deliberative process that culminated in Mapes' testimony. As discussed above, Mapes will argue at trial that he either misunderstood certain questions or was telling the truth when he claimed not to remember basic information about Madigan and McClain. The steps that preceded his testimony, including the immunity order, are relevant in response to that defense and cast doubt on any claim that his testimony was the product of confusion or inadvertence.

In addition, the fact that Mapes was compelled to testify helps explain why he repeatedly claimed lack of memory and recall. A blanket denial would be easy to disprove; Mapes could not refuse to answer questions because of the immunity order; and he did not want to implicate Madigan and McClain by testifying truthfully. That

---

[7] Mapes' claim that the government included reference to the defendant's immunization as a way to "send a signal to other witnesses" in this investigation is false. Dkt. 30 at 4. Allegations that a witness was immunized prior to testifying have been a feature of indictments for decades and they were not motivated by some purported need to send a signal to other witnesses. *See United States v. Burke*, 01 CR 1049 (N.D. Ill.) [ECF #21] (referencing witness's receipt of immunity prior to testimony); *United States v. Spann*, 15 CR 279 (N.D. Ill.) [ECF#51] (same). In any event, inquiries regarding the subjective intentions or motivations of a government agent or investigating officer are irrelevant to determining the factual guilt or innocence of a defendant. *See United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming the exclusion of evidence offered to show that the "indictment was a political instrument"); *United States v. Goulding*, 26 F.3d 656, 667 (7th Cir. 1994) (noting that, even in the context of an entrapment defense, the trial court properly did not "allow the defense to mount an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant").

left the option he pursued: he falsely claimed he did not recall information, thereby foreclosing follow-up questions.

The fact that Mapes was immunized will also make it clear to the jury that he was not unfairly put at risk of implicating himself in criminal activity by testifying. In this sense, it is very important that the jury know that the government was not abridging defendant's fifth amendment rights in any way by compelling his testimony.

Finally, in the event Mapes testifies at trial, the Chief Judge's order would be relevant on cross examination, to confirm that Mapes knew he was required to tell the truth and knew of the importance and sensitivity of the grand jury's investigation.

Contrary to Mapes' contention, the probative value of the indictment's references to the fact that he was immunized is not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Crim. P. 403. Rule 403 is not meant to sanitize a defendant's criminal conduct or exclude relevant evidence whose absence will create "a chronological and conceptual void," leaving the jury to speculate. *See United States v. Pulido*, 69 F.3d 192, 202 (7th Cir. 1995) (affirming admission of triple murder in drug conspiracy prosecution); *see also United States v. Vretta*, 790 F.2d 651, 656 (7th Cir. 1986). Rather, evidence should be excluded as unfairly prejudicial under Rule 403 only if it has a tendency to blind the jury and encourage a verdict "on a purely emotional basis," rather than on the evidence presented. Fed. R. Evid. 403 (advisory committee's note); *United States v. Wantuch*, 525 F.3d 505, 518 (7th Cir. 2008). Here, the indictment's limited references to Mapes' immunization are highly probative as

to the circumstances under which he was required to testify and should not be stricken. *See United States v. Norwood*, 982 F.3d 1032, 1052-53 (7th Cir. 2020).

### III. Defendant's Motion Seeking Potential *Brady* and *Giglio* Material (Dkt. 31) Should Be Denied.

Mapes requests every document in the government's multi-year, wide-ranging corruption investigation that discusses Madigan, McClain, and Mapes. Dkt. 31. The Court should deny Mapes' overly broad request for all materials that mention Madigan, McClain, or Mapes, as this information is not discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963) or *Giglio v. United States*, 405 U.S. 150 (1972). In addition, Mapes' request for early discovery of *Giglio* and Jencks Act discovery is premature.

#### A. Applicable Law

While district courts have broad discretion to manage discovery in criminal cases, *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977); *States v. Bastanipour,* 697 F.2d 170, 175 (7th Cir. 1982), there are narrow grounds upon which a criminal defendant may demand discovery from the government. Rule 16(a) of the Federal Rules of Criminal Procedure requires the government to produce upon request documents and data "material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E)(I), subject to applicable privileges. Documents are material if they would enable the defendant to "substantially alter the quantum of proof in his favor," *United States v. Orzechowski*, 547 F.2d 978, 984 (7th Cir. 1976), not simply because they bear an "abstract logical relationship" to the issues in the case," *United States v. Farah*, 475 Fed. Appx. 1, 6 (4th Cir. 2007) (distinguishing "materiality" standard

governing discovery in criminal cases from the lesser "relevance" standard in civil cases).

The government also has discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500, with which the government intends to fully comply. Relevant here, the government's *Brady* obligations, largely co-extensive with its Rule 16 obligations, are limited to documents and information that are material; *Brady* "does not grant criminal defendants unfettered access to government files" just because the defense believes they may contain helpful materials. *United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010). A defendant bears the burden to "make at least a *prima facie* showing that the requested items are material to his defense." *United States v. Thompson*, 944 F.2d 1331, 1342 (7th Cir. 1991).

**B. Analysis**

The government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States,* 405 U.S. 150 (1972), and 18 U.S.C. § 3500. Moreover, the Court has admonished the government with respect to its ongoing obligation to disclose favorable information to the defense, pursuant to *Brady* and its progeny. Dkt. 11. As of the filing of this response, the government has made approximately four separate discovery productions and has fulfilled its discovery obligations under Federal Rule of Criminal Procedure 16. And in a letter dated June 8, 2021, the government promised to produce materials required by 18 U.S.C. § 3500 and *Giglio* three weeks in advance of trial for those witnesses whom the government intends to call, with two limited exceptions: if such material is obtained less than two

weeks prior to trial, it will be produced promptly upon receipt; and second, if certain information should be withheld for witness safety or other reasons, the government will notify defendant that information is being withheld and will provide it as soon as possible and in time for its use. Indeed, the material produced thus far goes well beyond the government's disclosure obligations. For example, the defense requested early disclosure of grand jury transcripts and interview reports for certain witnesses described in the indictment, and the government agreed to produce those materials, even though such Jencks Act material need not be produced at this time, as discussed below.

Despite these representations and despite the voluminous productions made by the government, Mapes nevertheless moves for an order requiring the United States to disclose *all* materials in a multi-year, wide-ranging investigation that mention Madigan, McClain, or Mapes. Dkt. 31 at 1. Mapes' contention that *any* item that mentions Mapes, McClain, or Madigan by name contains *Brady* or *Giglio* material is unsubstantiated, premature, and overly broad.

Despite the overbreadth of Mapes' request, the government will produce all FBI reports of interview conducted to date in the investigation related to Madigan. The government anticipates this production will be available in approximately five weeks. The government will not, however, agree to produce all grand jury transcripts of potential witnesses, before either side has exchanged witness lists. The government will produce grand jury transcripts of any witness it intends to call at trial three weeks before trial, unless the transcripts contain *Brady* material in which

case they will be promptly produced. The government's proposed schedule is appropriate, because in contrast to *Brady*, *Giglio* and Jencks Act material need not be disclosed prior to trial. *See* 18 U.S.C. § 3500(a) (in a criminal prosecution "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case"); *United States v. Sharp*, No. 04 CR 797, 2005 WL 2124488, at *1 (N.D. Ill. June 8, 2005); *United States v. Dicosola*, No. 12 CR 446, 2013 WL 505223, *7 (N.D. Ill. Feb. 12, 2013) (government's promise to produce *Giglio* and Jencks material two weeks before trial was sufficient; denying defendant's motion for earlier disclosure); *United States v. Cerro*, No. 06 CR 427, 2006 WL 2472135, at *1 (N.D. Ill. Aug. 23, 2006) (disclosure of *Giglio* material one week before trial was reasonable).[8] The government's proposed schedule is reasonable and provides the defendant more than sufficient time to use this information.

As an alternative basis to deny defendant's motion, it is well-established in this Circuit that the government's acknowledgement of its obligations under *Brady* and *Giglio* and assurances to comply with those obligations render defendant's motion moot. *E.g., Dicosola*, 2013 WL 505223, *6-7; *United States v. Dean*, No. 09 CR

---

[8] With the exception of *Brady*, the government is under no obligation to identify witnesses whom it does not intend to call at trial, to produce the statements of such witnesses, or to provide information that might reflect negatively on the credibility of potential witnesses. *United States v. Sims*, 808 F. Supp. 607, 616 (N.D. Ill. 1992) (government is not required to produce statements of prospective witnesses or individuals who will not be called as witnesses, unless they contain *Brady* material). To the extent defendant's motion seeks this, or similar information, it should be denied.

446, 2010 WL 706038, at *2 (N.D. Ill. Feb. 24, 2010); *United States v. Lillie*, No. 08 CR 717, 2009 WL 1406667, at *2-3 (N.D. Ill. May 15, 2009) ("[T]he government correctly notes that courts in this Circuit consistently have held that where the government has made assurances it will comply with *Giglio* and *Brady*, those assurance are sufficient, and defendant's discovery motion was denied as moot.") (citation omitted).

To be clear, the government's acknowledgement of its obligations under *Brady*, *Giglio,* and the Jencks Act should not be interpreted as a stipulation to provide defendant with all of the materials requested in defendant's motion. To the extent that defendant's demands for *Giglio* and *Brady* material (or other material) are broader than what is required by the law, any such request should be denied. *See United States v. Michael*, No. 13 CR 902, 2014 WL 5901661, at *2 (N.D. Ill. Nov. 13, 2014) (denying as moot defendant's request for *Brady* and *Giglio* information and denying outright defendant's requests for information that is not required to be disclosed under *Giglio*); *United States v. Sims*, 808 F. Supp. 607, 614-15 (N.D. Ill. 1992) ("To the extent that the defendants seek information not required by *Brady/Giglio*, their [discovery] motions are denied.").

**CONCLUSION**

For the reasons set forth above, Mapes' pretrial motions should be denied.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

By:  /s/ *Julia K. Schwartz*
DIANE MACARTHUR
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5326

Dated: May 17, 2022