UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21 CR 345 |
| v. | Hon. John F. Kness |
| TIMOTHY MAPES | |

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT MAPES' MOTIONS IN LIMINE

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits the following response to defendant Timothy Mapes' motions *in limine* (Dkt. 66-71). As discussed below, Mapes' motions misstate the applicable relevance and hearsay rules in an effort to remove from the jury wide swathes of probative evidence. This evidence demonstrates that Mapes lied in the grand jury when he testified that he did not know what interactions McClain had with Madigan from 2017 to 2019. The evidence reveals that Mapes knew McClain was working on a piece of legislation related to property in Chinatown for Madigan (Dkt. 71), and that Mapes contacted Madigan's lawyer after FBI agents contacted Mapes in 2019 (Dkt. 69). The evidence also shows Mapes' frequent communications with McClain concerning a wide range of personal and professional topics and their close relationship with each other.

The Court should also deny Mapes' motions to exclude his invocation of the fifth amendment and that he received statutory immunity. Dkt. 68. The government's proposed redactions to testimony and exhibits will properly protect Mapes'

constitutional rights while, at the same time, appropriately allowing the government to present probative evidence of the circumstances surrounding Mapes' grand jury testimony.

Finally, the Court should deny Mapes' motion to bar the testimony of former First Assistant United States Attorney Gary Shapiro (Dkt. 67). Mr. Shapiro will provide probative, helpful, and neutral information about the role of the grand jury in criminal investigations, as he has done in a prior perjury trial in this district.

For the reasons discussed below, Mapes' motions should be denied.

## <u>BACKGROUND</u>

On February 12, 2021, defendant Timothy Mapes was served a subpoena to testify before a federal grand jury. The grand jury was investigating Michael Madigan's efforts to accept and solicit bribes in connection with Madigan's role as Speaker of the Illinois House of Representatives. The grand jury was investigating the relationship between Madigan and Michael McClain, Madigan's friend and a former state legislator, and their participation together in bribe-related activity. Dkt. 1, ¶ 1(e). Mapes served as Madigan's Chief of Staff, among other roles, during the relevant time period. On February 21, 2021, Mapes, through his defense attorney, asserted his fifth amendment privilege against self-incrimination in response to the grand jury subpoena.

On March 24, 2021, about a week before defendant Timothy Mapes testified in the grand jury, Chief Judge Rebecca Pallmeyer entered an order granting Mapes derivative use immunity pursuant to 18 U.S.C. § 6002. The order directed Mapes to

testify before the grand jury and provided that no testimony or evidence presented by Mapes to the grand jury through his testimony could be used against him other than in an instance where he lied under oath.

On the morning of his testimony, March 31, 2021, Mapes appeared before Chief Judge Pallmeyer in person and, at that time, Chief Judge Pallmeyer admonished Mapes that the order required him to testify truthfully before the grand jury and that, if he failed to do so, he could face prosecution. Mapes appeared before the grand jury later the same day and testified falsely in response to questions posed to him.

On May 26, 2021, the grand jury returned a two-count indictment against Mapes based on his grand jury testimony. Count One charges Mapes with perjury in violation of Title 18, United States Code, Section 1623(a). Dkt. 1, Count 1. Count Two charges Mapes with attempted obstruction of justice in violation of Title 18, United States Code, Section 1512(c)(2). Dkt. 1, Count 2.

## CHARGES AGAINST MAPES

Mapes' motions *in limine* too narrowly construe the charges against him, inconsistent with the indictment and the applicable law. Count One, the perjury charge, relates to seven episodes in which Mapes testified falsely in the grand jury that he either did not know or did not recall information concerning Michael McClain's work for and interactions with Michael Madigan from 2017 to 2019. *Id.* In order to meet its burden as to Count One, the government must prove that:

1.  The defendant, while under oath, testified falsely before a United States grand jury;

2.  The defendant's testimony concerned a material matter; and

3

3. The defendant knew the testimony was false. Mistake, confusion, or faulty memory do not constitute knowledge that the testimony was false.

Seventh Circuit Pattern Criminal Jury Instructions (2022 ed.) at 750.

Count Two, the attempted obstruction of justice charge, is broader than the perjury count, as Count Two alleges that Mapes testified falsely, in an attempt to obstruct, influence and, impede an official proceeding about a number of topics. Those topics include: (i) whether McClain told Mapes about McClain's communications with Madigan between 2017 and 2019; (ii) whether Mapes knew McClain did work for Madigan between 2017 and 2019 and whether McClain told Mapes about that work; (iii) whether Mapes knew McClain took action on Madigan's behalf during that period, including by communicating messages to and from Madigan; (iv) whether Mapes knew about McClain's communications with two elected representatives on Madigan's behalf in 2018; (v) whether Madigan asked Mapes to pass messages to McClain in 2017 2017; (vi) whether McClain told Mapes about McClain's communications with Madigan's staff from 2017 to 2019, and (vii) whether Mapes knew about Madigan's impressions of Individual C, ComEd's CEO. Dkt. 1, Count 2, ¶ 2.

The elements of the attempted obstruction count are also broader than the perjury count. At trial, the government must prove that:

1. The defendant attempted to obstruct, influence, or impede any official proceeding; and

2. The defendant acted corruptly.

Seventh Circuit Pattern Criminal Jury Instructions (2022 ed.) at 715. "A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice." *Id.* at 718.

## ARGUMENT

### I.     The Court Should Allow Testimony About Mapes' Immunization (Dkt. 68).

The government identified the March 31, 2021 transcript of Mapes' appearance before Chief Judge Pallmeyer and Chief Judge Pallmeyer's immunity order as exhibits the government will seek to admit at trial. The government intends to call Frances Ward, the court reporter for Chief Judge Pallmeyer, to authenticate the March 31, 2021 transcript. Mapes now moves to bar the admission of the transcript and order and Ms. Ward's testimony. Dkt. 68. Mapes claims that any reference to his invocation of the fifth amendment or to him being immunized is in contravention of his constitutional right to silence. *Id.*  at 1. Mapes argues that the government wants to use the transcript and the immunity order, not for any relevant purpose at trial, but as "substantive evidence of his guilt." *Id.*

Mapes' claims, both about the evidence the government seeks to admit, and the government's intentions in offering it, are unfounded. Before Mapes filed his motion, the government proposed to defense counsel that references to Mapes' invocation of the fifth amendment be redacted from the transcript and the immunity order. Mapes ignores the government's offer in his motion and incorrectly claims the jury, through the government's use of the exhibits, will learn about his invocation. *E.g.,* Dkt. 68 at 1. The government's proposed redactions demonstrate that the

5

government, rather than acting in contravention of Mapes' rights as Mapes claims, is operating fully in good faith by removing the information from the exhibits.

The government has previously set forth the relevance of the jury knowing that Mapes received immunity in the Response to Mapes' Motion to Strike Surplusage from the Indictment, and the Court indicated during a status hearing on May 24, 2023 that the Court would be issuing a written ruling denying defendant's pretrial motion on this topic. *See* Dkts. 30, 39, 62.

### A. Mapes' Constitutional Rights Will Not be Violated Through the Redactions Proposed by the Government.

The Fifth Amendment forbids either comment by the prosecution on an accused's silence or instructions by the court that such silence is evidence of guilt. *Griffin v. California,* 380 U.S. 609, 615 (1965). Accordingly, to safeguard a defendant's fifth amendment right against self-incrimination, the government cannot offer a defendant's failure to testify as substantive evidence of guilt. *United States v. Willis,* 523 F.3d 762, 773 (7th Cir. 2008). Thus, direct reference by a prosecutor to a defendant's decision not to testify at trial is a violation of a defendant's fifth amendment right against self-incrimination. *United States ex rel. Burke v. Greer,* 756 F.2d 1295, 1300 (7th Cir. 1985).

In this case, both the March 31, 2021 transcript and the immunity order contain references to Mapes' invocation of the fifth amendment after he was served with a subpoena to testify before the grand jury. The references to be redacted appear in the March 31, 2021 transcript on page 2, lines 19 through 22, and in the immunity

order on page 1, lines 4 through 6 and lines 13 and 14.[1] By removing references to Mapes' invocation of the fifth amendment, as the government proposes, the jury will not draw any negative inferences about Mapes' guilt based on his invocation of the fifth amendment.

The jury should, however, learn that Mapes was immunized before he appeared before the grand jury. The invocation of the fifth amendment and the bestowing of immunity are not so tied together that if one is removed the other too must follow. Mapes disagrees and cites *United States v. Seltzer,* 794 F.2d 1114 (6th Cir. 1986), in support of his claim that both the invocation of the fifth amendment *and* the grant of immunity should not be heard by the jury unless the defendant opens the door to such evidence. Dkt. 68 at 2-3.

The *Seltzer* case involved perjury by the defendant before a grand jury. The grand jury in *Seltzer* was investigating tax-related crimes against the United States by defendant's former employer. 794 F.2d at 1115. The defendant was called before the grand jury in 1981 and, after being informed of his rights, refused to answer questions on the ground that his answers might incriminate him. *Id.* at 1115-16. The prosecutor then asked the grand jury foreman to read to the defendant an order of immunity signed by a district court judge that had been obtained prior to the defendant's testimony. *Id.* at 1116. The defendant had an opportunity to talk about

---

[1] Mapes filed a copy of the March 31, 2021 transcript and the immunity order under seal as exhibits to his motion *See* Dkt. 68, Group Ex. A (under seal). The government will file under seal a copy of the March 31, 2021 transcript and the immunity order with its proposed redactions for the Court's review. *See* Gov. Group Ex. A.

the order with his attorney and, when the defendant returned to the grand jury room, he answered questions posed to him. *Id.* The defendant was called again to testify before a grand jury in 1983 about his former employer. *Id.* The defendant was informed during the course of his 1983 testimony that the grant of immunity did not protect him from prosecution for perjury in the grand jury. *Id.* The defendant was subsequently indicted for perjury based on the 1981 and 1983 grand jury testimony. *Id.* at 1117. The district court judge subsequently dismissed the perjury counts as to the 1981 testimony but allowed the government to use a transcript of the 1981 grand jury appearance, to the extent relevant, to prove the counts related to the 1983 grand jury appearance. *Id.*

At trial, the district court judge first raised the subject of defendant's immunization at a sidebar conference conducted in the midst of the government's opening statement. 794 F.2d at 1121. The judge stated that he believed it would be inappropriate for the jury to know that the defendant testified only with a grant of immunity. *Id.* The government later asked the court to prohibit the defense from implying that the defendant was a willing, cooperative witness. *Id.* The judge said he would allow testimony concerning the immunization order if defense counsel opened that door. *Id.* Based on the defendant's testimony during his case-in-chief, the district judge ruled that the defendant had opened the door to testimony about his

8

immunization and the government questioned him about the fact that his testimony was compelled in both 1981 and 1983. *Id.* at 1121-22.

On appeal, the Sixth Circuit held that the district court did not abuse its discretion in allowing cross-examination and prosecutorial comment during rebuttal argument about the defendant's invocation before the grand jury of his fifth amendment privilege. *Id.* at 1123. The Sixth Circuit held as follows:

> [W]e believe that there was no error in allowing the government to mention the compelled nature of [the defendant's] testimony in an effort to dispel any vision of him as a cooperative witness. We believe the cross-examination and prosecutorial comment [in rebuttal argument] upon [defendant's] invocation before the grand jury of his fifth amendment privilege was not improper given the particular circumstances of this case.

*Id.*

Mapes argues that the same restrictions from *Seltzer* should apply here, that is, the door to evidence that he invoked his fifth amendment privilege and received immunity should only be opened if he testifies that he was a willing, cooperative witness.[2] But *Seltzer* is not controlling here, not only because it is an out of circuit opinion, but because it is distinguishable. In *Seltzer,* the defendant invoked the fifth amendment and received immunity in the same 1981 grand jury appearance. Thus, when the district court judge expressed concern about the propriety of the jury hearing about the defendant being immunized, the two events were tied together.

---

[2] Mapes claims that, during a meet and confer session, the government told him that the government seeks to admit the immunity evidence to counter a defense claim that Mapes was a willing and cooperative witness. Dkt. 68 at 3. This is one reason, but, as set forth in the filing that took place before the meet and confer sessions about motions in limine Mapes was considering filing, the government made clear the multiple reasons why the government believes the immunity evidence is relevant.

9

The district court's apparent concerns about the propriety of the jury learning the reason for the grant of immunity are not present here, because Mapes' invocation preceded his appearance in the grand jury, and is therefore easily redacted. The district court in *Seltzer* never considered the situation presented here, where, the government proposes to redact from the exhibits any reference to the defendant's invocation of the fifth amendment.

The defendant in *Seltzer* also provided substantive responses to the prosecutor's questions during both grand jury appearances. Here, in contrast, Mapes answered "I don't recall" multiple times in response to questions. The fact that Mapes received immunity and was admonished that he was required to answer and to tell the truth before his testimony is probative of the way he chose to respond to the questions posed to him. Mapes, by responding "I don't recall," hoped both to not run afoul of the obligation to answer the questions created through the immunity order and to not provide any helpful information to the government at the same time.

## B. Mapes' Immunization Is Probative and Is Not Unduly Prejudicial.

Mapes' claim that evidence of him receiving immunity is irrelevant is also unfounded.

As the government has previously argued (Dkt. 39), the fact that Mapes was immunized and admonished by the Chief Judge is relevant to materiality, because it underscored the importance of Mapes' truthful testimony. Put differently, when testimony is secured by statutory immunity, as it was in Mapes' case, the imperative to tell the truth is that much stronger. Mapes' refusal to tell the truth even in the

face of the statutory protection that he was afforded demonstrates that his testimony was part of a calculated effort to lie.

The March 31, 2021 transcript and immunity order are also relevant because they tend to show that Mapes was not caught by surprise in the grand jury. The immunity order and admonishment by the Chief Judge were two steps in a deliberative process that culminated in Mapes' testimony. The steps that preceded his testimony, including the immunity order, are relevant because they cast doubt on any claim that Mapes' testimony was the product of confusion or inadvertence.

In addition, and as noted above, Mapes answered "I don't recall" in response to many questions. The evidence at trial will show that these answers were false. Mapes' immunization is relevant to his motivation with regard to those false answers: because Mapes received immunity, he knew he was required to answer questions in the grand jury, so he chose to answer questions in a manner that he thought would be difficult to prove was false. The fact that Mapes was immunized is therefore probative of both the perjury charge in Count One and the attempted obstruction charge in Count Two of the indictment.

Mapes argues that, even if relevant, the evidence about him being immunized is unduly prejudicial. *See* Fed. R. Crim. P. 403. But Rule 403 is not meant to sanitize a defendant's criminal conduct or exclude relevant evidence whose absence will create "a chronological and conceptual void," leaving the jury to speculate. *See United States v. Pulido*, 69 F.3d 192, 202 (7th Cir. 1995) (affirming admission of triple murder in drug conspiracy prosecution); *see also United States v. Vretta*, 790 F.2d 651, 656 (7th

Cir. 1986). Rather, evidence should be excluded as unfairly prejudicial under Rule 403 only if it has a tendency to blind the jury and encourage a verdict "on a purely emotional basis," rather than on the evidence presented. Fed. R. Evid. 403 (advisory committee's note); *United States v. Wantuch*, 525 F.3d 505, 518 (7th Cir. 2008). The evidence here, with any reference to Mapes' invocation of his fifth amendment rights redacted, will explain to the jury the legal process that brought Mapes into the grand jury and his resulting obligation to truthfully answer questions. The evidence presented in this form will not have a tendency to blind the jury or to encourage a verdict based on a purely emotional response.

Mapes' concern that the jury may speculate as to why he received immunity is overblown. The evidence about immunity will much more likely make it clear to the jury that, by being compelled to give testimony through the immunity order, Mapes was not unfairly put at risk of implicating himself in criminal activity by testifying. This will assure the jury of the fairness of the proceeding as opposed to prompting speculation about Mapes' own concerns about criminal exposure.

### C. No Mini-Trial on Advice Given by White Collar Defense Attorneys to Clients Will Be Necessary.

Mapes argues that introducing evidence about Mapes receiving immunity will require a mini trial to explain to the jury why white-collar criminal defense attorneys routinely ask for immunity for their clients. Dkt. 68 at 4-5. This argument has no merit. The evidence the government seeks to admit about immunity—the March 31, 2021 admonishment through the transcript and the immunity order—do not reference who asked for immunity or why. The only way in which the question of why

12

Mapes received immunity becomes relevant is if, as in *Seltzer,* Mapes testifies and portrays himself as a willing and cooperative witness. And, even then, the question is why *Mapes* asked for immunity for which the answer is presumably fairly simple, *e.g.*, because his attorney recommended he do so. There is no need to delve into counsel's general practices as a white-collar criminal defense attorney.[3] A mini-trial here on the issue of why immunity was requested is neither necessary nor appropriate.

## II.  The Court Should Permit Gary Shapiro to Testify About the Grand Jury Process (Dkt. 67).

### A.  The Proposed Testimony Will Provide the Jury with Necessary Information About the Grand Jury Process.

A grand jury is an investigative body that operates in secret in order to protect the integrity of the investigation and the identity of those individuals brought before it. Federal Rule of Criminal Procedure 6(d) limits the individuals who can be present in the grand jury room while testimony is presented. *See* Fed. R. Crim. P. 6(d). As a result, this process, as well as its differences from a courtroom or "petit" jury, are not widely known. The grand jury, for example, unlike a petit jury, considers evidence

---

[3] Mapes claims, without any evidence, that the government threatened him. Dkt 68. at 4. The government did no such thing. Mapes should be barred from cross examining witnesses regarding his baseless claim that he was threatened. Such examination would be without evidentiary support and entirely irrelevant, as discussed in the government's motion *in limine* seeking to bar allegations of outrageous government conduct and questioning concerning the government's motives. Dkt. 64 at 7-10.

under a probable cause standard, not a reasonable doubt standard, and the grand jury's decisions are based on a majority vote, not a unanimous vote.

The grand jury proceeding of which Mapes was a part will play a critical role in this case, as it forms the basis of the perjury and attempted obstruction charges against him. The jurors at trial will not know the differences between the jury on which they serve and the grand jury proceeding about which they will hear unless those differences are explained to them. The government proposes to call in its case-in-chief Gary Shapiro to provide this neutral explanation. Mr. Shapiro worked in the United States Attorney's Office (USAO) in the Northern District of Illinois between 1990 and 2014 in a variety of roles including, for the majority of those years, as the office's grand jury coordinator and as First Assistant U.S. Attorney. Mr. Shapiro's grand jury-related responsibilities included working with the Chief Judge to orient members of a new grand jury about their roles and duties and supervising the USAO's use of the grand juries including, among other things, the scheduling of time before the grand jury, the testimony of witnesses, and legal issues. Mr. Shapiro, through his years of service, is familiar with the operation of the grand jury and the type of information brought before a grand jury.

The government intends to elicit testimony from Mr. Shapiro on direct examination about the following areas: (1) the meaning of the designation "special" grand jury and the titles given to grand juries[4]; (2) the length of a grand jury's service;

---

[4] Mapes was indicted by the "Special January 2019 Grand Jury." This title appears on the first page of the grand jury transcript of Mapes' testimony.

(3) the number of persons who serve on a grand jury; (4) how frequently a particular grand jury meets; (5) the use of subpoenas to obtain documents during a grand jury investigation[5]; (6) the administration of the oath to tell the truth to a witness; (7) the persons allowed to be present in the grand jury room when a witness testifies; (8) the process of a witness testifying before a grand jury, *i.e.*, by question and answer, and who may question the witness; (9) a witness's access to his attorney during his grand jury testimony; (10) the numbering of grand jury proceedings within the USAO; (11) the role of investigating agencies in a grand jury investigation; (12) the secrecy of grand jury proceedings; (13) the impact of an order of immunity on a witness's testimony; (14) the role of the grand jurors in considering proposed charges; (15) the standard used to evaluate the evidence in relation to the proposed charges, *i.e.*, probable cause and not proof beyond a reasonable doubt; and (16) the number of grand jurors required to vote in favor of an indictment before the indictment is issued.

The Seventh Circuit has approved this type of description of the grand jury process in other jury trials. For example, in *United States v. Garcia,* 562 F.2d 411 (7th Cir. 1977), the Seventh Circuit approved of a jury instruction that explained the indictment and the grand jury process that led to its issuance. The district judge instructed the jury, in pertinent part:

> You are going to take with you into the jury room the indictment in this case, and I want you to understand what its significance is, and what it is not.
>
> .     .     .

---

[5] Mapes produced documents pursuant to a grand jury subpoena during the investigation. The government will move for the admission of some of these documents at trial.

A grand jury consisting generally of 23 members of your fellow
veniremen when you came in on the first day were selected to serve on
the November grand jury. Twenty-three of them. They listen to
information presented by the government, not necessarily evidence
because under the rules the grand jury may hear information which
would not be admissible at a trial, but they hear information, and on the
basis of the information they hear they make a determination whether
or not there is probable cause to proceed further, to hold a trial, to find
out whether or not in fact the defendant committed a crime.

They make no determination of the guilt of the defendant. They are not
supposed to. They are supposed to be simply the first screening process
by which a preliminary determination is made whether or not to go
further with the case, to hold a trial.

The first people who are going to make any determination as to the guilt
or innocence of these, are going to be you people. Nobody else has made
that determination before. . . .

562 F.2d at 416-17.

The Seventh Circuit held that the instruction "was a fair, careful, and accurate
attempt" to avoid an inference that a charge leveled by a grand jury would weigh on
the side of guilt for the petit jury. 562 F.2d at 417. The court noted that the instruction
did so more effectively than "a mere statement than an indictment is not evidence
and permits no inference of guilt." *Id.*

The proposed testimony of Mr. Shapiro is offered here for a different reason
than in *Garcia*, that is, not to explain the significance of the indictment, but to explain
the grand jury process in a trial that involves perjury and attempted obstruction
before the grand jury.[6] Mr. Shapiro's proposed testimony nevertheless mirrors the
jury instruction approved in *Garcia* as both accurate and helpful to the petit jury.

---

[6] In *Garcia,* the defendants were charged with drug-related offenses.

Mr. Shapiro's anticipated testimony about the grand jury process is not unprecedented. Mr. Shapiro provided testimony similar to that proposed here in the government's case-in-chief in a recent perjury trial in this district. *See United States v. Beena Patel,* No. 17 CR 297 (N.D. Ill.) (Ellis, J.). Mr. Shapiro's testimony in *Patel* included the same topics outlined above, with the exception of the information about immunity which was not at issue in the *Patel* trial.[7]

The accepted practice of informing the petit jury about the grand jury process in a perjury case is also demonstrated by the fact that, in order to prove the materiality element of the offense, the government at times calls a member of the grand jury to describe the investigation. *See, e.g., United States v. McComb,* 744 F.2d 555, 564 (7th Cir. 1984) (the government can establish the required nexus between the grand jury's investigation and the charged false statements through, among other means, testimony from the grand jury foreperson or a member of the grand jury). The testimony of the grand jury foreperson or a grand jury member would, by necessity, require that person to describe the grand jury and its function to the petit jury.[8] Mr. Shapiro will provide this same type of testimony about the grand jury process.

---

[7] The government produced to Mapes' counsel a transcript of Mr. Shapiro's testimony in *Patel* after Mapes filed his motion challenging Mr. Shapiro's testimony in this case.

[8] The government intends to call a law enforcement witness, and not a member of the grand jury, to testify about the investigation in support of the materiality element.

### B. The Proposed Testimony Fully Complies with the Federal Rules of Evidence.

Mapes claims that Mr. Shapiro's testimony will violate Rules 401, 403, 602, 701, and 702 of the Federal Rules of Evidence. Dkt. 67. These objections are based on speculation concerning what Mr. Shapiro will testify about. The proposed areas of Mr. Shapiro's testimony, as outlined above, demonstrate that defendant's objections are unfounded.

Mr. Shapiro will not refer to the facts of this case or to anything that Mapes said in the grand jury. Instead, Mr. Shapiro will provide general and neutral information about the grand jury process. This testimony is relevant, and necessary, because it will provide the petit jury with general knowledge about the process that gave rise to the charges in this case. *See* Fed. R. Evid. 401(b) ("Evidence is relevant if . . . the fact is of consequence in determining the action.").

Mr. Shapiro also will not be asked to render any opinions or to draw any conclusions during his testimony. Rules 701 and 702, concerning testifying in the form of an opinion, are thus inapplicable to Mr. Shapiro's proposed testimony by their plain terms. Mr. Shapiro's descriptions about the grand jury process are based on his own perceptions and, given the lack of familiarity of the petit jury with the process, will be help the petit jury evaluate the facts in this case. Contrary to Mapes' motion (Dkt. 67 at 3), Mr. Shapiro's knowledge is not "specialized" as that term is used in Rule 701, even if Rule 701 did apply here (which it does not because Mr. Shapiro will not offer opinions). Mr. Shapiro's knowledge of the grand jury process comes from his day-to-day participation in it. *Cf.* Fed. R. Evid. 701, Advisory Committee Notes, 2000

Amend. (particularized knowledge acquired through participation in day-to-day affairs of business is not experience, training, or specialized knowledge within the realm of an expert).

Mapes also incorrectly argues that Federal Rule of Evidence 602 bars Mr. Shapiro's testimony. Dkt. 67 at 3. That rule simply provides that a witness must have "personal knowledge of the matter." Fed. R. Evid. 602. Mr. Shapiro plainly has ample personal knowledge of the grand jury process, which will be the subject of his testimony. *E.g., United States v. Mendiola*, 707 F.3d 735, 741 (7th Cir. 2013) ("the knowledge required by Rule 602 is not absolute or unlimited knowledge but simply that awareness of objects or events that begins with sensory perception of them, a comprehension of them, and an ability to testify at trial about them.").

Mapes' claim that Mr. Shapiro's testimony is unduly prejudicial under Rule 403 is also misplaced. It will be clear to the jury at trial that the United States Attorney's Office is involved in the grand jury process—Assistant United States Attorneys from that office questioned Mapes in the grand jury—and that AUSAs are representing the United States Attorney's Office at trial. It will make perfect sense to the jury, then, and will not cause any over crediting of the testimony, that a former member of the United States Attorney's Office has been called upon to explain the grand jury process to them. The fact that Mr. Shapiro will not testify to any facts in Mapes' case will demonstrate that Mr. Shapiro is a neutral witness who is simply providing them with information about the grand jury process.

In fact, Mr. Shapiro left the United States Attorney's Office well before Mapes' testimony. He is thus uniquely qualified to be a detached yet knowledgeable witness to present process-based information to the jury. The calling of a member of the grand jury to provide information about the grand jury process might, in fact, be more prejudicial to Mapes. In *United States v. Awadallah,* 401 F.Supp.2d 308 (SDNY 2005), a case involving perjury before the grand jury, the district court judge rejected the government's request to call members of the grand jury as witnesses because of two possible sources of prejudice: (1) the petit jury might identify with members of the grand jury as peers and thus give the testimony of the grand jury members more weight; and (2) the introduction of testimony from a grand juror might confuse the different standards of proof that apply to a trial and to the grand jury. 401 F.Supp.2d at 318-19. These concerns are not present with Mr. Shapiro's testimony due to the absence of any connection that he has to the grand jury that issued the indictment against Mapes.

Mapes expresses unfounded concern that, like the name of John Lausch that appears on Mapes' indictment, the jury will conclude and give undue weight to the fact that Mr. Shapiro's name appeared on indictments when he served as United States Attorney. Dkt. 67 at 5. But the signature line of the United States Attorney will be redacted, as it always is, on the indictment that is given to the jury during deliberations, so Mr. Lausch's name will not appear. The jury will not learn that Mr. Lausch's or Mr. Shapiro's names were on indictments, so Mapes' concern lacks merit.

Finally, to the extent Mapes is concerned that Mr. Shapiro is *too* well credentialed, this is simply not a basis to exclude highly probative evidence.

In short, the probative value of eliciting evidence on the grand jury process far outweighs any possible prejudicial effect.

### III. Mapes Incorrectly Contends that Swathes of Highly Probative Testimony Should Be Excluded.

Mapes' motions to exclude certain recordings (Dkt. 66), to exclude evidence concerning his testimony about a parcel of land in Chinatown (Dkt. 71), and to exclude evidence of an interview he had with FBI in 2019 (Dkt. 69) are premised on a misunderstanding of relevance rules and their application to this case. The Court should allow the government to present the highly probative categories of evidence described below and should deny defendant's motions. The government respectfully recommends that the Court rule on the subject matter and applicable evidentiary principles discussed below, which will obviate the need for the Court to rule individually on every challenged exhibit. The government requests the Court rule that the following topics are relevant and admissible for the reasons discussed below.[9]

(1) All communications between Mapes and McClain, including communications concerning Mapes' resignation;

(2) Mapes and McClain's communications concerning Madigan's response to sexual harassment allegations, with reference to harassment allegations against Mapes redacted.

---

[9] These are meant to be examples and not an exhaustive list of relevant subjects.

(3) Evidence concerning Mapes' knowledge of the Chinatown transfer legislation;

(4) Evidence concerning Mapes' meeting with FBI in 2019 and his conversations with McClain about that contact.[10]

### a. Relevant Evidence Should Be Admitted, Subject to Rule 403 Balancing.

Mapes incorrectly argues that, in order to be relevant, evidence must directly relate to a matter he discussed in the grand jury. *E.g.,* Dkt. 66 at 6, 17. This is not the standard for relevance.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Fed. R. Evid. 401. ""To be relevant, evidence need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, 'but it must in some degree advance the inquiry.'" *E.E.O.C. v. Indiana Bell Telephone Co.,* 256 F.3d 516, 533 (7th Cir. 2001).

Under Rule 403, relevant evidence should only be excluded where its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Mere prejudice to the defendant is not reason enough to exclude evidence. *United States v. Curry,* 79 F.3d 1489, 1496 (7th Cir.1996). Most relevant evidence presented in a prosecution is prejudicial to the defendant. In order

---

[10] Mapes' motion is focused on the recordings the government seeks to play at trial, but the government's arguments in response apply equally to email communications and other documents.

to be excluded, the evidence must be unfairly prejudicial. *Id.* The Comments to Rule 403 state that "unfair prejudice means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Thus, courts apply Rule 403 in a manner that favors the admission of relevant evidence, and only exclude evidence when unfair prejudice threatens to overwhelm its probative value. The greater the probative value of the evidence, the more willing the court will be to tolerate some risk of prejudice. *United States v. Torres,* 977 F.2d 321, 328 (7th Cir.1992). As the Seventh Circuit explained in *United States v. Suggs,* 374 F.3d 508, 516 (7th Cir. 2004), "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented."

### b. Mapes Ignores Categories of Highly Probative Evidence

Mapes incorrectly claims that broad categories of probative evidence should be excluded. He ignores that evidence can be relevant to a fact in issue even if it does not concern a specific false statement alleged in the indictment or question posed in the grand jury. For example, evidence may be relevant to show why false statements were material, or it may be relevant to one of the broad categories of topics about which Mapes falsely testified, as set forth in Count Two. *See* Dkt 1, Count 2, ¶ 2. Or evidence may be relevant to Mapes' motivation to lie in the grand jury. Some of those categories that Mapes claims are irrelevant are discussed below.

### i. Mapes and McClain's Relationship

Evidence demonstrating Mapes' and McClain's close personal relationship is highly probative. Mapes' lies in the grand jury were extremely broad; he claimed not

to recall *any* work McClain performed for Madigan from 2017 to 2019; *any* times McClain passed messages for Madigan during that period; or *any* conversations McClain had with Madigan. It is essential that the jury learn about the close relationship between McClain and Mapes before, during, and after the 2017 to 2019 timeframe. Their close relationship and consistent communications demonstrate that Mapes could not have forgotten the critical role McClain played in Madigan's political operation when he testified in March 2021. Indeed, the sheer volume of personal calls (and other communications) between the two men is compelling evidence of their close relationship. The jury should hear this highly probative evidence, irrespective of the particular subject matter the two men were discussing.[11]

The volume of calls between the two men is also highly probative, particularly where, as here, the defense will be that Mapes had a failure of memory.[12] It is much more difficult to simply forget information when it was shared with you on multiple occasions, as opposed to a single call. Here, Mapes had dozens of calls with McClain in the nearly one year of the wiretap. The government should be permitted to introduce evidence that Mapes and McClain communicated frequently concerning a wide range of topics, from personal to professional.[13]

---

[11] The Court has allocated three weeks for this trial. Both sides will be able to present their evidence in this time, and likely in less time. The trial schedule is not a basis to exclude highly probative, admissible evidence.

[12] On July 5, 2023, Mapes' counsel sent the government an expert disclosure pursuant to Federal Rule of Criminal Procedure 16, which indicates that Mapes plans to elicit testimony concerning memory. The government separately moves to exclude this expert.

[13] The government has excerpted portions of the intercepted communications in order to ensure that the evidence is presented in an efficient, cohesive manner.

In addition, Mapes seeks to exclude many calls in which McClain told Mapes about McClain's interactions with Madigan or his work for Madigan. Any communications in which McClain tells Mapes about interactions with Madigan is relevant, as they demonstrate that Mapes' repeated testimony that he did not know what McClain did for Madigan from 2017 to 2019 was false.

ii. <u>Mapes' and McClain's Discussions About Mapes' Resignation</u>

The parties agreed to stipulate about the date and circumstances surrounding Mapes' sudden resignation on June 6, 2018 after working as Madigan's Chief of Staff for 25 years.[14] The government agreed to this stipulation, so that the jury will not hear about the harassment allegations against Mapes. However, the government's agreement that the jury will not hear the specific allegations against Mapes does not render all communications about his resignation inadmissible. *E.g.,* Dkt. 66 at 19.

Mapes' reaction to his sudden departure, and his communications with McClain about his departure, are highly probative. Mapes' calls with McClain about his resignation demonstrate how close the two men are. For example, in McClain's call to Mapes the day Mapes resigned, McClain told Mapes that "you're the only

---

[14] The parties have agreed to the following stipulation:

> Tim Mapes served as the Chief of Staff for the Office of the Speaker of the Illinois House of Representatives from December 1992 to June 6, 2018, with the exception of a period from 1995 to 1997 when Madigan was not Speaker. He also served as the Clerk of the Illinois House of Representatives from June 22, 2011 to June 6, 2018, and the Executive Director of the Democratic Party of Illinois from April 1998 to June 6, 2018. On June 6, 2018, the then Speaker of the House, Michael Madigan, asked for Tim Mapes' resignation from each of those three positions after allegations of inappropriate workplace professionalism surfaced regarding Tim Mapes. The parties agree that the truth of these allegations has no relevance to this case. Tim Mapes immediately resigned all three of his positions on June 6, 2018.

person's made me cry today," and "[a]nything I can do, ya know, I'm willing to do, you know that, don't ya?" GX22. McClain later told Mapes that he was "a little put out with" Madigan for the way he treated Mapes, and that he was thinking of telling Madigan, "I never thought you would be the one to leave the fox hole." GX27. This call shows McClain's close relationship with Mapes, and also shows the value these men placed on loyalty (leaving the "fox hole"). This call is therefore probative as to Mapes' motivation in lying before the grand jury: he wanted to remain loyal to McClain and Madigan.

Mapes and McClain's conversations about Mapes' resignation are not unfairly prejudicial. The government does not intend to argue that Mapes condoned or participated in any sexual misconduct or harassment. Instead, the evidence will be offered for the limited purpose of showing how close the two men were, and how memorable Mapes' sudden ouster must have been. If the Court were concerned about potential misinterpretation of this evidence by the jury, it could provide a limiting instruction to consider it strictly for proper purposes. *See, e.g., Bruce v. Levy Premium Foodservice Ltd. P'ship*, No. 3:16 C 2734, 2019 WL 11704226, at *5 (M.D. Tenn. Apr. 2, 2019) (denying motion *in limine*, reasoning that a limiting instruction that the case was not about sexual harassment, but about retaliation from sexual harassment complaints, was sufficient to clarify issues for the jury and reduce any prejudicial effect); *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, No. 16-cv-01702-BLF, 2018 WL 6439133, at *3 (N.D. Cal. Dec. 7, 2018) (while recognizing that discussion of sexual harassment "can stir the passions of the jury," concluding an instruction

26

limiting the use of such evidence to relevant issues can sufficiently reduce potential prejudice).

<ol type="i" start="3">
<li>Mapes and McClain's Discussions About Other Sexual Harassment Allegations</li>
</ol>

Mapes incorrectly argues that evidence of sexual harassment allegations involving other individuals is irrelevant.

Evidence of Mapes' and McClain's roles in responding to sexual harassment allegations that impacted the Speaker's Office in 2018 is also highly probative. The communications demonstrate that McClain and Mapes (until his resignation) were both involved in the political response to sexual harassment allegations on behalf of Madigan. Evidence that both men were involved in the response efforts is relevant, because it demonstrates that Mapes was aware of sensitive work McClain was doing for Madigan on this topic. This evidence thus contradicts Mapes' testimony that he had no knowledge or recall of any work McClain did for Madigan from 2017 to 2019.

In addition, the attempted obstruction count alleges that Mapes lied about whether he knew about McClain's communications with Public Official B, who McClain asked to step down from the House of Representatives on Madigan's behalf after a sexual harassment allegation. The sexual harassment allegations involving Public Official B are thus critical context for the jury to understand Public Official B's resignation, and the role McClain played in it.

There is no possible prejudice, as the allegations do not relate to Mapes but to other individuals. In addition, there will be no separate mini-trial over the sexual harassment allegations involving other people, because the actual substance of the

allegations is not critical. Indeed, Public Official B testified about those allegations and McClain's request that he step down, on Madigan's behalf, at the recent ComEd trial. An entire mini-trial did not ensue; in fact Public Official B was on and off the stand in a matter of hours.

### iv.  Chinatown Parcel Bill

Mapes devotes an entire motion to excluding evidence concerning the transfer of a piece of land in Chinatown from State ownership to City ownership by way of state legislation. Dkt. 71. At the time of Mapes' testimony, the government was investigating Madigan's and McClain's efforts to transfer the Chinatown parcel in order to facilitate a sale to a private developer that would, in exchange, hire Madigan's law firm for real estate tax work.[15] Significantly, Mapes testified in the grand jury that he had read about the government's investigation into the Chinatown parcel transfer. GJ Tr. at 143 (filed under seal at Dkt. 142).

The Chinatown transfer bill is relevant to Mapes' perjury and attempted obstruction trial because it is an example of an assignment McClain performed for Madigan that Mapes knew about. Specifically, McClain told Mapes that the Chinatown bill was one of his "assignments" from Madigan during a phone call recorded on May 30, 2018, while Mapes was still Chief of Staff responsible for legislation in the House of Representatives. GX17.  Particularly notable is the fact that McClain told Mapes that "it's an assignment *as you probably know,"* and that he

---

[15] This portion of the investigation resulted in charges against Madigan and McClain in Case No. 21 CR 115, currently pending before Judge Blakey. *See United States v. Madigan and McClain*, 22 CR 115, Dkt. 37, Counts 19 and 20 (N.D. Ill.) (Blakey, J.).

was "trying to get some uh legal, um, um, property transferred from the I, CDOT. . . it's in Theresa Mah's district [which includes Chinatown]." GX17 (emphasis added). This call, and the evidence that will be elicited from witnesses who will explain the details of the Chinatown transfer bill, is relevant because it shows that Mapes knew McClain did "assignments" for Madigan in 2018. The call is therefore compelling evidence that he lied when he said he was unaware of such assignments, as alleged in Count One of the indictment. Dkt. 1, Count 1, ¶ 7.[16]

GX17 is also relevant to materiality. Paragraph 1(e) of Count One (which is incorporated in Count Two) sets forth the background of the grand jury's investigation, including that the grand jury was investigating whether McClain performed sensitive tasks or work for Madigan, including work related to matters concerning the Illinois House of Representatives. Dkt. 1, Count 1, ¶ 1(e). GX17 is an example of a call that was important to the investigation on these, and other topics, because the Chinatown land transfer bill was one primary focus of the grand jury's investigation. Given that the government had a recording indicating that Mapes knew about the Chinatown transfer bill, law enforcement reasonably could have expected Mapes to provide information about that legislation. Thus, this call, is relevant to materiality.

Mapes' testimony about the Chinatown transfer is also relevant to Count Two, the attempted obstruction count. When Mapes was asked about the Chinatown bill

---

[16] As discussed below, McClain's statements to Mapes on recorded calls are admissible to place Mapes' responses in context and to show that Mapes was aware of McClain's work for Madigan.

in the grand jury, he testified that he had read about the Chinatown piece of the investigation in the newspaper. GJ Tr. at 143 (filed under seal at Dkt. 142). But he denied knowing anything about efforts to transfer the parcel and denied having any conversations with McClain about the property transfer. *Id*. at 142-143. He claimed not to have heard of it until he saw it in the newspaper. *Id*. at 143. When pressed, Mapes said "he [meaning McClain] could have alerted me to something" and recalled a visit from Theresa Mah, the state representative of the district covering Chinatown, but did not recall McClain's role. *Id*. at 145-46.

The attempted obstruction count in Count Two covers this type of deliberately misleading testimony. Specifically, Count Two alleges that Mapes testified falsely about whether McClain told Mapes about his communications with Madigan, whether Mapes knew McClain was doing assignments for Madigan, whether Mapes knew McClain was taking action on Madigan's behalf, and whether McClain told Mapes about assignments. Dkt. 1, Count 2, ¶¶2(a), 2(b), 2(c), 2(d). Mapes' grand jury testimony about the Chinatown parcel is one example of this type of false statements, which were intended to impede the grand jury's investigation. Thus, Mapes is simply wrong when he claims that "the "Chinatown' episode was not a basis for the indictment against Mr. Mapes." Dkt. 71 at 1.[17]

---

[17] Mapes cites no legal authority supporting his request for the production of grand jury arguments and deliberations concerning the Chinatown parcel. This undeveloped argument is therefore waived. Dkt. 71 at 3. In any event, it is meritless. *See* Fed. R. Crim. P. 6(e); *see also, e.g., United States v. Lisinski*, 728 F.2d 887, 894 (7th Cir. 1984) (affirming denial of request for grand jury material, where "[a]gainst the time-honored and serious policy of grand jury secrecy, Lisinski proffers an unsupported speculation that, possibly, insufficient evidence was presented to the grand jury to sustain the indictment").

In short, evidence concerning the Chinatown land transfer bill, and Mapes' knowledge of it, is unquestionably relevant to the charges against him. Mapes' motion to bar evidence concerning the Chinatown property should be denied. Dkt. 71.

### v. FBI Contact with Mapes in 2019

Mapes moves in a separate motion to exclude evidence of Mapes' conversation with FBI agents in 2019 and Mapes' subsequent conversation with McClain in which Mapes described talking to Madigan's lawyer about the meeting. Dkt. 69. Mapes' motion should be denied.

Mapes was approached by Central District of Illinois FBI agents on January 24, 2019 as part of an unrelated investigation. Mapes prepared a memo concerning the contact, which he testified about in the grand jury. Although the substance of the law enforcement contact is not significant (it was related to an entirely separate investigation), what Mapes did after that contact with FBI demonstrates his loyalty to Madigan and McClain and his intentional effort to withhold information from the grand jury.

Mapes testified in the grand jury that he may have shared his memo with Sheldon Zenner. GJ Tr. at 87 (filed under seal at Dkt. 142). Mapes testified that no one other than his attorney in the grand jury proceeding had told him Zenner represented Madigan. *Id.* at 89-90. Mapes also testified that he showed Zenner the memo in 2019 only for informational purposes and because he was a former Assistant

---

.

U.S. Attorney. *Id.* at 90-92. Mapes also said he didn't ask McClain to pass any messages to Madigan about Mapes' meeting with the FBI in 2019. *Id.* at 101-02. This testimony was false and misleading.

In a phone call recorded on February 15, 2019, shortly after Mapes' meeting with the FBI, Mapes told McClain about a conversation he had with Zenner about the meeting. Mapes had resigned as Madigan's Chief of Staff in June 2018—approximately seven months before this conversation took place. Mapes prefaced that description by saying that he told Zenner "it was a request" that Mapes give Zenner his memo, and that he was calling McClain to "report[] back in." A jury could readily infer that Mapes made these statements to McClain with the intent that McClain relay them to Madigan. At the end of the call, Mapes again says, "I'm just reporting in," again clearly showing that he was intending to keep McClain in the loop, so that Madigan too could be kept in the loop. GX78.

This call is also relevant to show that Mapes was aware of the government's investigation into Madigan in the Northern District of Illinois. McClain and Mapes discussed whether Zenner was surprised by the FBI contact in the Central District of Illinois. Mapes said that Zenner "thought it a little unusual . . . But he does, he has a same view that it's being precipitated by what's going in, on in the Northern District." GX 78. Although the relevant FBI contact was for a separate matter in the Central District, not the Northern District, Mapes' reaction that it may have something to do with the Northern District of Illinois shows that he and McClain were circling the wagons and comparing notes as it related to the federal

investigation in this district.[18] This is relevant as to Mapes motive for lying in the grand jury; it shows Mapes' loyalty to Madigan and interest in keeping Madigan's attorneys apprised of his contacts with law enforcement, both directly and by "reporting back in" to McClain as a messenger. This phone call is thus evidence of Mapes' knowledge and intent when he *later* testified in the grand jury about the same FBI interaction and the way in which Mapes chose to describe it; he was trying to protect Madigan.[19]

In this sense, this call – and Mapes' false statements concerning the call – are relevant to the charges in the indictment. The call is an example of McClain acting as an intermediary for messages to Madigan, which is relevant because Mapes is charged with giving false testimony about whether he knew McClain acted as a messenger for Madigan. *See* Dkt. 1, Count 1, ¶ 7(7) & Count 2, ¶2(e). GX 78 is particularly probative because it is an example of Mapes himself using McClain as a messenger, which demonstrates that Mapes was well aware of the role McClain played in conveying messages to and from Madigan.

Mapes claims there could be an attorney-client privilege issue with admitting evidence of his 2019 meeting with FBI agents (Dkt. 71 at 1-2). But Mapes confirmed in the grand jury that Zenner did not represent him at any point, and the government is aware of no instance in which Zenenr represented Mapes. GJ Tr. at 88-89 (filed

---

[18] For this and other reasons, Mapes is wrong that the government does not have evidence that Mapes knew about the federal investigation at the time of this call. Dkt. 69 at 2.

[19] The government does not intend to argue that it was unlawful for Mapes to approach Madigan's attorney, and Mapes' argument to that effect is a straw man. Dkt. 69 at 3.

under seal at Dkt. 142). Thus, any conversation between the two men could not have been privileged. Mapes did briefly mention his current counsel during his grand jury testimony, but no confidential matters were discussed. Mapes' testimony that his attorney told him who represented Madigan is not the type of confidential communications protected by the attorney-client privilege. *See United States v. Snyder*, No. 21-2986, 2023 WL 4011163, at *4 (7th Cir. June 15, 2023) (privilege protects "confidential communications between attorney and client made for the purpose of seeking or providing legal advice").

In sum, there is no basis to exclude relevant, probative evidence concerning Mapes' 2019 meeting with FBI agents, the call between McClain and Mapes about it, and Mapes' testimony about that same topic. His motion should be denied. Dkt. 69.

## IV.  Mapes Misapplies Applicable Hearsay Rules.

In addition to misconstruing the rules regarding relevance, Mapes' motion also misstates the relevant hearsay rules and their application in this case. Dkt. 66. Below is a summary of the primary hearsay rules and principles that Mapes overlooks in his motion.

### a.  Out-of-court Statements That Are Not Offered For Their Truth Are Admissible.

Mapes incorrectly argues that "in Mapes' conversations with McClain that were captured on wiretaps, McClain's statements remain hearsay *unless* Mapes adopted them." Dkt. 66 at 2. But McClain's statements are admissible even if Mapes did not specifically adopt them, not for their truth, but for context and to show Mapes' own knowledge. The conversations show, for example, that Mapes had knowledge

that McClain was bragging about doing assignments with Madigan. The conversations also show the deeply personal, and thus memorable, nature of their communications.

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Whether a statement is hearsay depends on the purpose for which it is offered. *See United States v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004) (affirming admission of out-of-court statement when offered as background information to put the actions of a person in context). If an out-of-court statement is offered only to prove that it was made and not to prove the truth of the matter asserted, the out-of-court statement is admissible. *See Anderson v. United States,* 417 U.S. 211, 220 n. 8 (1974).

It is well-established that an out-of-court statement is not hearsay when it is offered for background or context and not for the truth of the matter asserted. *United States v. Van Sach*, 458 F.3d 694, 701-2 (7th Cir. 2006); *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002); *United States v. Akinrinade*, 61 F.3d 1279, 1283 (7th Cir. 1995). For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id*. at 580 (defendant's responses

"would have been unintelligible without the context provided by [the informant's] statements").

Relatedly, out of court statements offered to explain why a witness subsequently took certain action are not hearsay, because they are not offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c)(2). Rather, such statements are admitted as "verbal acts." That is, the significance of the statements is "that they were said . . . not the truth-value of what was said." *United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996) (requests or orders are not hearsay); *see also Lee v. McCaughtry*, 892 F.2d 1318, 1325 (7th Cir. 1990) (statements offered to explain why defendant changed his story not hearsay); *United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991) (statements offered to explain circumstances under which witness made earlier statement not hearsay). Likewise, a statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999)

Many of the statements Mapes seeks to exclude on the recordings on the basis of hearsay are, in reality, "verbal acts." The significance of the words spoken to Mapes, as in *Robinzine*, is that they were said and thereby affected the defendant. The words are not significant for their truth. Below is a non-exhaustive list of categories that are admissible non-hearsay.

*McClain's Statements to Mapes*. Here, McClain's statements to Mapes are admissible, even if he did not expressly adopt them. *United States v. Davis*, 890 F.2d

36

1373, 1380 (7th Cir. 1989) (upholding admission of entirety of tape-recorded conversations because informant's statements "are necessary to place the defendant's statements in a proper context" and "making them intelligible to the jury and recognizable as admissions"). Mapes is incorrect, then, when he suggests that one half (the McClain half) of the conversations cannot be admitted against him.

_McClain's Statements to Others About Assignments for Madigan._ Another example of McClain's statements that are admissible for non-hearsay purposes are recordings in which McClain bragged to individuals other than McClain about his work for Madigan. _E.g.,_ GX88, GX89. These are admissible not for their truth (in other words, not to show that McClain actually did work for Madigan), but to show that McClain announced to anyone who would listen that he did work for Madigan. This is particularly relevant given that Mapes will likely argue that Madigan was secretive and tight-lipped and therefore did not disclose information about his inner circle. The fact that McClain freely discussed work for Madigan and interactions with Madigan are therefore relevant, whether or not McClain really was doing work for Madigan. Indeed, some of the questions Mapes was asked in the grand jury concern whether Mapes had _heard_ about any interactions between McClain and Madigan from _any source._ For example, Mapes was asked broad questions such as "Do you have _any_ reason to think [McClain] was acting as an agent for [Madigan] after he retired in 2016, that is, doing work for him or carrying out assignments for him?" and "Do you recall _anyone_ ever describing _any_ work—_anyone at all_ describing any work or assignments [McClain] was performing on [Madigan's] behalf?" Dkt. 1, Count 1,

37

¶ 7 (emphasis added). Mapes responded that he was not aware of any such question to the first question. *Id.* In response to the second, he said, "I don't recall that—that I would have been part of any of that dialogue. I don't know why I would be." *Id.* The fact that McClain regularly claimed to act on Madigan's behalf to individuals in and around the political world in Springfield is admissible for the non-hearsay purposes.

### c. Mapes' Statements Are Admissible for their Truth.

Mapes also incorrectly claims that "[f]or recordings involving Mapes, his own statements might well be admissible if they are relevant and constitute admissions on a material fact." Dkt. 66 at 2. Again, this is an incorrect statement of the law.

A defendant's statements are admissible against him for their truth pursuant to Rule 801(d)(2)(A), which provides that "statement" is not hearsay if "[t]he statement is offered against a party and . . . was made by the party in an individual or representative capacity." All that is required by the rule is that the evidence be a statement "made by one party, but offered as evidence by the opposing party." *United States v. Reed*, 227 F.3d 763, 770 (7th Cir. 2000). Contrary to Mapes' contention, "statements admitted under Rule 801(d)(2)(A) need not be inculpatory," and need not

be "contrary to the trial position of the party." *Id.*; *see also United States v. McGee*, 189 F.3d 626, 632 (7th Cir. 1999).

Thus, Mapes statements are admissible during the government's case as statements of a party opponent, even if they are not specific admissions concerning a material fact.

### d. Adoptive Admissions Are Properly Admissible for their Truth.

Many of McClain's statements on the intercepted calls are admissible for their truth as to Mapes because Mapes adopted those statements. "A statement of which the party has manifested an adoption or belief in its truth is not hearsay." *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988) (quoting Fed. R. Evid. 801(d)(2)(B)). A party need not expressly state, "I adopt this person's statements as my own," in order for a statement to be admissible as an adoptive admission. *Id.* Instead, an adoption can occur in the course of a normal conversation when a defendant manifests a belief in the truth of another person's statements. *See United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (holding informant's side of telephone conversations with defendant admissible because they were adopted by the defendant during the course of the conversation when the defendant either led or responded to the informant's statements and at no time contradicted the informant's comments or questions).

### e. Many of the Challenged Recordings Are Admissible As Statements of Intention or Plan.

Mapes overlooks another hearsay exception that applies to many of the recordings, including those recordings in which Mapes is not a participant. In many

of those recordings, McClain and others describe their plans to see or speak to Tim Mapes. Those are not hearsay because "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" is excluded by the rule against hearsay. Fed. R. Evid. 803(3). Based on this rule, statements that a declarant made a plan to do something are admissible. *See, e.g., United States v. Hartmann*, 958 F.2d 774, 784 (7th Cir. 1992) (declarant's "declared intent to carry out the 'juice loan scam' was admissible to show intent to execute the plan as well as to prove that he, in fact, carried out that plan"); *see, e.g., United States v. Hughes*, 970 F.2d 227, 234 (7th Cir. 1992) (district court erred in excluding defendant's proffered evidence of his statement of his intent to go procedure drugs).

Here, the numerous calls in which McClain tells other people that he is on his way to meet with Mapes or that he plans to have Mapes and Mapes' wife over to his house are properly admitted as statements of intention or plan under Rule 803(3). *E.g.,* GX 48, GX49, GX67. .

## V. The Recording Excerpts the Government Has Identified Are Admissible (Dkt. 66).

The government recommends that the Court issue a ruling with regard to broad categories of evidence, rather than individual exhibits at this point in the proceedings. The government nevertheless addresses below the specific recordings Mapes has challenged. The government will tender a transcript binder with the transcripts of the relevant excerpts to the Court and defense counsel. (The

government will likely not seek to admit GX 14, 21, 23, 28, 38, 46, 61, 64, 65, 77, and 90 to 93, and thus Mapes' motion is moot as to those exhibits.)

> **a. Calls Between Mapes and McClain Before His Resignation on June 6, 2018.**

Mapes argues that many of the calls between him and Michael McClain are inadmissible hearsay or are irrelevant. As discussed above, all calls between McClain and Mapes are relevant because they show the close friendship between McClain and Mapes and Mapes' knowledge of McClain's work for Madigan. Their communications before Mapes' resignation on June 6, 2018 further show how closely the men worked together on matters related to Madigan.

GX3 (4/12/18). At the time of this call, Mapes was Madigan's Chief of Staff. McClain tells Mapes that "he [Madigan] didn't give me much work this time so, um, we're gonna head to the restaurant if you wanna join us." And contrary to Mapes' argument, it is a clear adoptive admission, because Mapes' response is "Very good, thank you." And even if Mapes had not adopted McClain's statement, the call is plainly relevant because it shows that Mapes was well aware that McClain was doing work for Madigan and interacting closely with Madigan. Mapes' knowledge of McClain's work for Madigan in 2018 is the exact subject Mapes is charged with lying about in Count One. In addition, McClain invited Mapes to dinner with Madigan and Mapes accepted, which shows how close the three men were. There is no basis to exclude this call.

GX4 (4/25/18). This call between McClain and Mapes is relevant, because they are discussing how to respond to a private entity's request for a lobbyist

recommendation related to legislation in Springfield. The call shows McClain and Mapes' close relationship, including on matters related to business in the House of Representatives. In the call, the men also discuss "the list" of lobbyists, a reference to a list of lobbyists preferred by Madigan that McClain maintained. This portion of the call demonstrates that Mapes was well aware of McClain's work identifying lobbyists on Madigan's behalf.

GX5 (4/26/18). This call between McClain and Mapes is relevant because it shows McClain's awareness of Mapes and Madigan's schedule. Mapes tells McClain that he's going to dinner with Madigan. McClain then informs Mapes that he learned of an opening on the state board of elections. Significantly, McClain told Mapes: "Yeah, and so Chuck [Scholz] said that he'd be glad uh, if we had a name or somebody, he'd be glad to uh, try to uh, work on the executive director's mind." This is an example of Madigan sharing information with Mapes, to then share with Madigan. The "we" in that sentence was a reference to Madigan; McClain was telling Mapes that a state board position had opened up and Madigan was being offered the chance to have an input on the new appointee. This is a clear example of McClain acting as a messenger for Madigan.

GX6 (5/1/18). This call is yet another example of McClain performing sensitive work for Madigan, which is a topic Mapes lied about in the grand jury. It is a conference call involving Madigan, McClain, Mapes, and others to discuss how to address sexual harassment concerns in the House of Representatives and the Democratic Party. McClain is the only participant who is not on Madigan's staff. The

call will not be offered for its truth—namely what Madigan and his team plan to do to address sexual harassment. Instead, the call will be offered to show Madigan working with his inner circle on a sensitive issue, and the fact that both Mapes and McClain were involved in that inner circle. Although Mapes claims "Mr. Mapes is not charged with lying or obstructing justice relative to sexual harassment issues in Springfield" (R. 66 at 6), he was charged with lying about what work McClain did for Madigan in 2018, the year of this recording. This call shows McClain giving detailed advice to Madigan about what to do to address sexual harassment issues and how to handle a committee appointed for that purpose. The call thus demonstrates Mapes' knowledge of McClain's role in Madigan's inner circle who was privy to sensitive information. This call presents no Rule 403 concern, because they do not even discuss the substance of sexual harassment allegations in the call and nothing in the call implicates Mapes, Madigan, or McClain in any sexual harassment incident. The probative value of this call far outweighs any potential prejudice, even if there is any prejudice.

GX7. In this call, Mapes tells McClain that the plan is for McClain to meet Madigan and Andrew (Andrew Madigan is Madigan's son) for dinner. This call thus demonstrates that Mapes knew McClain was meeting with Madigan in 2018. In fact, Mapes was acting as intermediary; by telling McClain of the dinner plans on behalf of Madigan. Mapes told McClain, "So, I, I was gonna give you an update on your life, after you get to Springfield. . .  one is, now you're having dinner at Saputo's tonight." GX7-T at 1.  It is therefore relevant to the allegation in Count 2 that Mapes testified

falsely about whether Madigan gave messages for Mapes to pass along to McClain. Dkt 1., Count 2, ¶ 2(k). The second excerpt involves Mapes telling McClain about something Madigan wanted to discuss with McClain, referring to this as McClain's "the to do list I had to give you" from Madigan. GX7-T. In the final excerpt, they once again discuss dinner plans with Madigan and McClain says he'll be there in a half hour. GX7-T. Mapes claims that this call is not admissible because he wasn't specifically asked about it in the grand jury. R. 66 at 7. But again, Mapes' lies were much broader, and calls like this one are unquestionably relevant to show that Mapes knew of McClain's role within Madigan's orbit in 2018.

GX15 (5/30/18 at 6:26 p.m.). This call again is an example of Mapes and McClain discussing sensitive political issues that affect Madigan. It is the first of four calls between the two men on one night. McClain fills Mapes in on a woman who accused then-Representative Public Official B of sexual harassment. At the end of the call, McClain gives Mapes advice as to how Public Official B should address the allegations, and Mapes says "okay." Contrary to Mapes' motion, this is an adoptive admission, but in any event it is admissible to show Mapes was on notice of the sensitive role McClain played in matters affecting Madigan and the Speaker's Office. This call is relevant for the additional reason that Mapes specifically lied about Public Official B, as alleged in Count Two of the indictment. Dkt. 1, Count 2, ¶ 2. This and other calls show that Mapes is highly attuned to the drama surrounding Public Official B and McClain's role in mitigating the fall-out for Madigan. This call thus makes it more likely that Mapes was well aware of McClain's role in forcing Public

44

Official B out of office months later, in the fall of 2018. (There are also calls between Mapes and McClain about Public Official B's ouster, but this earlier call also makes it more likely that Mapes would not have somehow forgotten those later calls.)

GX16 (5/30/18 at 9:34 p.m.). In this short follow-up call, Mapes tells McClain that "we're in the midst of all kind of things going on," including related to Public Official B. McClain offers to share what he knows, and Mapes says 'let me put you on with the boss. Okay? . . . so you're going to inform him what you know and go from there." This call demonstrates as clear as day that Mapes knew McClain communicated with Madigan in 2018, because Mapes sets up that conversation. It also is an example of McClain working for Madigan, helping get information to him about a brewing sexual harassment scandal. Although the call was minimized, and thus the conversation with Madigan was not included in the recorded portion, the excerpted portion nevertheless clearly shows the manner in which McClain was brought in to help with sensitive issues impacting the Speaker's Office.

GX17 (5/30/18 at 9:34 p.m.). This is another call on May 30, 2018 concerning the allegations involving Public Official C and other matters.

First, Mapes and McClain discussing a sensitive news story about Madigan, and Madigan's concerns that someone was recording his conversations, again showing the close relationship and McClain's and Mapes' secure spots in the Madigan inner circle.

The conversation then turns to one of McClain's "assignment[s]" from Madigan related the Chinatown parcel, discussed above. GX17. McClain related that "in my

case uh it's an assignment as you probably know. I'm trying to get some uh legal, um, um, property transferred from the I, CDOT. . . it's in Theresa Mah's district [which includes Chinatown]." As discussed above, this portion of the call is relevant because it shows that Mapes knew McClain did "assignments" for Madigan in 2018, and thus is compelling evidence that he lied when he said he was unaware of such assignments, as alleged in Count One of the indictment. Dkt. 1. It is also relevant to materiality.

The final exchange in the call is also relevant. Mapes asks McClain, "so any suggestions for tomorrow? For anything, the boss, the family, I don't care?" GX17. Then men then proceeded to discuss goings-on in the House of Representatives and Springfield. This call shows how Mapes would ask McClain for advice when he was Madigan's Chief of Staff, which shows McClain's inside role.

Finally, it is also relevant that this is the third call between the two men on May 30, 2018. The sheer number of calls between these two men on a single day is probative as to Mapes' testimony about his memory.

GX18 (5/30/18 at 9:57 p.m.) This call immediately follows the preceding call, after the call was dropped. After a period of minimization, the men begin discussing Individual C, who McClain views is a "complete asshole." Later in the call, McClain gives Mapes advice about information he's "heard from some of the lobbyists" that Mapes should "factor in your own thinking." The intel was that the "Speaker's no longer leading," and is "a captive of his caucus." This is an example of McClain passing on information relevant to Madigan, using Mapes as an intermediary. In the call they also discuss Madigan's strengths as a leader, which is relevant in that it

demonstrates the two men's loyalty to Madigan. This loyalty helps to explain Mapes' motivation for lying in the grand jury.

### b. Calls Between Mapes and McClain After Mapes' June 6, 2018 Resignation.

GX20 (6/6/18). This voicemail is relevant because it is the first phone contact between Mapes and McClain after word of Mapes' resignation on June 6, 2018. McClain reaches out to offer his support to Mapes: "you know I'm there for ya, so, ahem, whatever I can do to help, all you gotta do is call on me." This call shows how close their friendship is. This message would not be offered for its truth, and thus there is no hearsay issue. Finally, Mapes is wrong that he had to have been asked about a call for it to be relevant and admissible. Dkt. 66 at 17. That is simply not true. The government is not required to present evidence to a witness to ensure truthful testimony in the grand jury.

GX22 (6/6/18). This is a deeply personal call between Mapes and McClain on the day of Mapes' resignation. McClain tells Mapes, "you're the only person's made me cry." Mapes describes how he was about to resign at DPI. They then describe the "goofy accusations" against Mapes, without any specifics mentioned. McClain tells him he loves him and they discuss seeing each other the next day. This call is relevant because it shows the extremely close relationship and McClain's loyalty to Mapes..

GX25 (6/10/18). In this call, like many of the others that follow, McClain checks in on Mapes after his sudden resignation and also shares the personal news of his mother's worsening health. After that, they discuss how Mapes is "trying to adjust" to life post-resignation. They then discuss Mapes job prospects after his resignation

and the concerns that companies might have in hiring him and his experience cleaning out his office. (Again there is no mention of the specifics of the allegations against Mapes.). This call demonstrates how close the men were, how sudden Mapes' resignation really was, which makes it less likely that Mapes would have simply forgotten many of his interactions with McClain when he testified.

GX26 (6/10/18). This is a message in which McClain asks if Mapes would like to have dinner with him. This is relevant because it shows the men's close relationship and how McClain was checking on Mapes. As discussed above, Mapes need not adopt the statement for it to be admissible, as it would not be offered for its truth. In any event, Mapes' return call confirms that he did, in fact, receive the call.

GX27 (6/10/18). This is Mapes' return call to McClain, declining his dinner invitation. On the call they discuss how McClain's wife recently lost her mother and how difficult a time she is having, again demonstrating how close the two men are. In this call, Mapes and McClain do not discuss Mapes' resignation, but it's clear that McClain is checking in on Mapes after his resignation. As noted above, contrary to Mapes' contention, the parties' stipulation as to Mapes' resignation does not render irrelevant all of the subsequent communications between Mapes and McClain, which demonstrate the close relationship between the two men.

GX29 (6/11/18). This recording is McClain leaving a message for Mapes, which is relevant because it shows McClain is again checking in with Mapes after his resignation.

GX30 (6/11/18). This is Mapes' return call to McClain. McClain tells Mapes that his mother is dying and cancels plans they have. McClain tells McClain that he would never "leave the foxhole" and "I'm staying in the foxhole with you, sir," again demonstrating the loyalty the two men share. This call is therefore relevant in that it shows a personal relationship and loyalty. Mapes argues that "the Government does not contend that Mapes' testimony about his personal relationship with McClain was perjurious, making this call irrelevant to the jury's deliberation of the issues of perjury and obstruction." Dkt. 66 ag 20. But Mapes did lie about what he knew about McClain. Although he admitted to being friends with McClain, he was selective in what he revealed, and strategically claimed lack of knowledge or recall any time a question about McClain was posed that touched on the government's investigation. Particularly for the attempted obstruction count, which more broadly relates to Mapes' pattern of obstructive testimony, the jury should hear about the full scope of Mapes' relationship with McClain, not the limited, false version that Mapes portrayed in the grand jury.

GX31 (6/12/18). In this short call, McClain tells Mapes that his mother passed away, again showing their close connection.

GX33 (6/20/18). In this call, McClain informs Mapes that he had a conference call in Will Cousineau's office (another member of Madigan's inner circle, and that afterwards he planned to come see Mapes in Springfield. Their plans to meet in person are relevant because they show the men were talking at length, not just on the phone but also in person, which makes it more likely that McClain was informed

Mapes in person of what was happening in the Speaker's orbit after Mapes' resignation.

GX34 (6/20/18). McClain and Mapes again discuss meeting in Springfield, which is relevant as discussed with regard to GX33.

GX36 (6/21/18). For the bulk of this call, Mapes and McClain discuss matters concerning the Democratic Party of Illinois ("DPI"), including fundraising, personnel issues, and replacing Mapes as executive director of DPI. This call is highly probative. After Mapes' abrupt resignation, DPI was left without an executive director. This call demonstrates that Mapes knew McClain was helping Madigan with DPI operations and fundraising after Mapes resigned. Mapes argues that because topics were not discussed in the grand jury, they cannot be relevant. Dkt. 66 at 22. Not so. Again and again, Mapes testified that he was not aware what work McClain was doing from 2017 to 2019, as alleged in Count One. GX 36 is directly relevant to that false testimony.

GX37 (6/22/18). In this call, McClain discusses his plans in Springfield, which includes potentially meeting up with Mapes. Then Mapes discusses his abrupt resignation, noting that other friends took six years to resign, whereas Mapes "retired in ten minutes." This portion of the call is relevant as it speaks to how significant Mapes' retirement was, which makes it more likely that he would have remembered events and conversations around that critical time in his life. McClain also makes a reference to the work *McClain* does: "my wife definitely would say I'm not retired yet." This is directly relevant to Mapes' knowledge as to the perjury count.

GX41 (6/27/18). In this call McClain passed along well-wishes to Mapes from people he had seen, which again shows McClain checking in on Mapes after his resignation. Mapes and McClain then discuss Mapes' efforts to find employment. McClain then relays a conversation he had with Madigan "last week" about how to reallocate work after Mapes' departure, This is of course relevant to Mapes' false testimony that he was not aware of the interactions between McClain and Madigan. It is also relevant to show that McClain was stepping into Mapes' shoes after he left, and Mapes knew about it. Specifically, McClain relayed that he told Madigan "I don't think you guys, uh, your family understands anything about what uh, Tim did for you," and that McClain told Madigan that Mapes had sent out Christmas cards, dealt with Madigan's wife, for example. The two men also discussed DPI personnel issues in the wake of Mapes' departure.

GX43 (7/3/18). In this call, McClain reported to Mapes that Madigan had canceled a July 4th fundraiser because his wife had pneumonia. McClain also tells Mapes that Madigan had been complaining about getting back into the "personnel business," a reference to the gap left in Madigan's world after Mapes' departure. Both are examples of McClain filling Mapes in on what was happening in Madigan's orbit after Mapes' resignation, which demonstrate that Mapes knew McClain was communicating with Madigan. In the second short clip, Mapes mentions that he is planning to see McClain the following week.

GX44 (7/5/18). McClain starts this call by referencing a dinner he had just had with Madigan, where the restaurant was loud. Mapes joked, "what you need to say is

that I'm Mike McClain, I'm the right-hand guy to Mike Madigan." McClain quipped back, "I'm the right-hand guy of Tim Mapes." This call could not be more probative as to Mapes' knowledge; he expressly states that he knows McClain is Madigan's "right-hand guy," a fact which he claimed to know nothing just three years later in the grand jury. The remainder of the call is about personal matters. McClain asks about Mapes' son, which shows their close personal connection. In the second portion of the call, McClain tells Mapes that "we" (a reference to Madigan and the Speaker's Office) "hired a crisis management company" to address sexual harassment issues and that Madigan was sending his new Chief of Staff to Washington D.C. to "meet with some of these uh, MeToo groups." McClain said their goal was to "protect the boss." This demonstrates that Mapes knew McClain was still advising Madigan about sexual harassment response. The parties' stipulation as to Mapes' resignation does not render this call irrelevant because this call does not specifically relate to the allegations against Mapes, but the broader "Me Too" response that was impacting Madigan and his staff in 2018. McClain also expressed concern that the sexual harassment independent investigation may result in Madigan being forced to step down. In the second excerpt, McClain asked for Mapes' advice about what to tell Madigan if that happened, so he could tell Madigan, "that Tim and I worked on this since July." This shows the two men together discussing sensitive matters related to Madigan, and demonstrates that Mapes knew McClain was helping Madigan with these political issues.

GX51 (7/26/18). In this call, McClain tells Mapes that he's on an "assignment regarding" a member of the House of Representatives, and whether that member was going to vote for Madigan as Speaker. This is an example of McClain telling Mapes about an assignment he was doing for Madigan, and it is thus highly probative as to Mapes' lies about that same topic. The two men also discuss the transition to new leadership at DPI. Mapes also asks how the "boss," which shows that he knew McClain was in contact with Madigan. McClain responds that he will tell him when he gets to Mapes, which shows they planned to meet. McClain also describes the fundraising work he was doing for Madigan, and joked that it used to be the "Mapes McClain program," a reference to their fundraising efforts, which McClain was forced to take over after Mapes' resignation. This call is therefore highly relevant to the charges in the indictment.

GX53 (7/26/18). In this call, Mapes and McClain discuss meeting for a beer, which shows that, in addition to communications by phone or email, they were also meeting in person.

GX56 (8/6/18). In this call, Mapes and McClain make a plan to meet outside a Barnes and Noble so that McClain can give Mapes something, which again shows that they met regularly.

GX57 (8/21/18). In this call, McClain tells Mapes that he is in Chicago to meet with Public Official C about gaming legislation (which Public Official C will testify about at trial) and that he was having dinner with Madigan. This is yet another example of McClain relaying assignments he was working on for Madigan and

describing plans to meet with Madigan. Mapes also asks McClain if "they" had started "Sunday phone calls," a reference to Sunday review meetings held by Madigan and his close staff in the Speaker's Office, which the jury will also hear about at trial. Again, this call shows that Mapes is well aware that McClain is doing work for Madigan. Mapes also asks about Public Official B, and if there had been any report as to the sexual harassment allegations against him. The entirety of this call shows how much detail Mapes knows about McClain's comings and goings, in just one brief phone call.

GX60 (10/31/18). McClain complains to Mapes about the fundraising efforts involving DPI and Madigan's new Chief of Staff in the lead-up to the November 2018 election. Mapes promises that he'll send McClain lists for "JB," the incoming Governor of Illinois, indicating that he was helping Mapes prepare board and commission recommendations for Madigan. At the end of the call, the two men also discuss Madigan's efforts to force Public Official B to step down after sexual harassment allegations, which demonstrates that Mapes lied when he claimed he didn't know about McClain's involvement in Public Official B's resignation. All of the topics discussed in this call are highly probative as to Mapes' knowledge of McClain's work for and interaction with Madigan.

GX62 (11/2/18). This is a follow-up to GX61, in which Mapes tells McClain that he sent McClain a list of people interested in jobs, presumably meant to be shared with Madigan. Mapes gives McClain advice about where people should be placed and

what McClain should recommend to Madigan. This is an example of Mapes using McClain as a messenger to get to Madigan.

GX68 (11/26/18). In this call, McClain and Mapes make plans to meet for lunch, and also discuss Mapes efforts to help Madigan's wife with holiday gifts. The men's discussion of Madigan's wife shows their close relationship between Madigan, McClain, and Mapes.

GX75 (12/09/18). In this post-election call, McClain and Mapes discuss committee assignments in the General Assembly. McClain describes conversations he participated in with Madigan and Madigan's staff concerning committee assignments and leadership positions in the General Assembly, which the jury will hear is one of the Speaker's responsibilities in the House. It is therefore highly probative as to Mapes' knowledge of the sensitive work McClain was doing for Madigan with regard to General Assembly business and will be offered to establish the false nature of Mapes' grand jury testimony.

GX78 (2/15/19). This is the call between McClain and Mapes in which McClain describes his phone call with Sheldon Zenner, Madigan's lawyer. For the reasons discussed above, it should be admitted in full.

GX79 (2/16/19). In this call, Mapes and McClain discuss having a conversation later that day and McClain asks Mapes to "maybe bring that folder with ya" for their meeting. Given the timing, a reasonable inference is that the "folder" contained Mapes' memorandum about his meeting with FBI, which is relevant to show the two

men's close relationship and their likely discussion of Mapes' meeting with the FBI, discussed in more detail above.

GX80 (2/21/19). In this case, Mapes asked if McClain was "having a productive day with your conference calls," which shows that (contrary to Mapes' testimony in the grand jury) Mapes knew McClain was doing some form of work, even though he had retired from lobbying in early 2017. The two men continue their discussion of committees, again making it clear that McClain is advising Madigan on committee and leadership roles and Mapes is advising McClain on how to best advise Madigan, given that Mapes is by this point on the sidelines. This call demonstrates that Mapes knew McClain was doing work for Madigan.

GX81 (3/5/19). In this call, Mapes asks McClain if "the boss" was in that week, which shows he knows McClain is in touch with Madigan. The two men also discuss Individual C. They discuss two appointments to the Illinois Tollway Board, and Mapes jokes that Madigan must have had something to do with it. Mapes also asks McClain if he's having dinner with "the boss," again showing that he knows about McClain's interactions with Madigan. Mapes even expresses surprise that McClain would travel before the General Assembly's session is over, which shows that he knows McClain was doing work related to the General Assembly.

GX83 (3/20/19). This call shows that Mapes was well aware of McClain's work, even though McClain was purportedly "retired," because McClain tells him, "I got up at four-thirty, and I've been working ever since." They then briefly discuss a trip to Mexico.

GX84 (3/20/19). In this call, McClain remembered that it was the anniversary of Mapes' mother's death and expressed condolences. The fact that McClain knew Mapes' mother's death date shows their closeness.

GX87 (3/29/19). Among other topics, in this call, McClain describes Madigan's view on ComEd legislation, which was unquestionably relevant to the grand jury's investigation of corruption involving ComEd, had Mapes been forthcoming about it. In the call, Mapes also refers to Madigan having "agents," which is relevant because Mapes lied when he was asked whether he knew that McClain was one of Madigan's "agents" in the grand jury.

### c. Calls between McClain and Others

The government has identified a number of recordings of calls between McClain and other individuals. These calls are all admissible. As discussed above, many are not admissible for their truth but to show McClain's interactions with Madigan's close inner circle and the fact that McClain was loose-lipped about his assignments for Madigan. Many of the calls include statements of McClain's plans to meet with Mapes, which are admissible as statements of intention or plan under Federal Rule of Evidence 803(3). These calls are discussed below.

### a. Calls between McClain and Members of Madigan's Inner Circle

GX2 (4/9/18). This is a short call between Madigan and McClain in which Madigan asks when McClain will come to Springfield. They make plans to meet for dinner, which is admissible as a statement of intention or plan. This call is not offered for its truth.

GX9 (5/18/18). This is a call between McClain and Michael Madigan's son, where McClain relays that a representative went to see Mapes. McClain further relays a conversation with Mapes about sexual harassment allegations that they believed the representative played a role in. The call will not be offered for its truth (that the representative did, in fact, see Mapes or what Mapes actually said), but to show McClain acting as a messenger and conveying his knowledge of what Mapes was doing as Chief of Staff to Madigan, including on sensitive topics such as sexual harassment.

GX10 (5/21/18). This is a call between McClain and Will Cousineau. They are again discussing the sexual harassment allegations impacting the Speaker's Office and McClain mentions that he had advised Mapes about what to do, in his capacity as Chief of Staff. Again, this is not offered for its truth (that McClain actually advised Mapes or what was said), but to show how McClain, Cousineau, and Mapes are all part of Madigan's inner circle brainstorming with each other how to address serious sexual harassment allegations.

GX11 (5/22/18). This is another call between McClain and Cousineau the next day. McClain describes a request he got from a representative about gaming legislation, a topic about which the jury will hear evidence at trial. They discuss Madigan's negative impression of that representative, who was in the "penalty box," and that "somebody like Mapes" and put a brick on (or stalled) his bill. Later in the call they discuss another presentative who was in Madigan's bad graces. This call is not offered for its truth; that a representative was in the penalty box or Mapes stalled

a bill, but is relevant to show members of Madigan's inner circle discussing matters in the General Assembly that impact Madigan.

GX12 (5/24/18). This is a call between McClain and Public Official C, who will testify about trial. The indictment alleges that Mapes gave testimony about McClain's interactions with Public Official C. Dkt. 1, Count 2. The two men are generally discussing gaming legislation, a topic that is relevant because McClain tells Mapes in another call (GX57) that one of McClain's "assignments" from Madigan was to work with Public Official C on gaming legislation. The bulk of the call will not be offered for its truth but to show McClain playing the exact role he told Mapes about; advising Public Official C on gaming. Significantly, when Public Official C asks how to move the bill, McClain tells him, "let me check with Mapes." This last statement is admissible as a statement of intention or plan under Rule 803(3), and it is relevant because it shows McClain's plan to talk to Mapes about gaming legislation.

GX13 (5/25/18). In this call, McClain tells Cousineau that he should talk to Mapes about a piece of legislation one of Cousineau's lobbying clients want on a bill. This is not offered for its truth. Instead it's a piece of advice, and thus admissible as a "verbal act" rather than for its truth. Cousineau will be able to testify about this call, and the role Mapes played in the Speaker's Office both before and after his resignation.

GX19 (6/6/18). This is call between McClain and Madigan's son on the day of Mapes' sudden resignation. Madigan's son says "apparently Tim is gonna resign both as chief of staff and as, uh, ya know political director." This is admissible as a

statement of intention or plan, and not for its truth, and it shows two members of the inner circle discussing Mapes' resignation before it was finalized.

GX39 (6/23/18). This is a call between McClain and Madigan, in which the two men make plans to have dinner together in Chicago. It is admissible as a statement of intention or plan under Rule 803(3).

GX45 (07/06/18). This is a call between McClain and Madigan, in which the two men make plans to have meet. It is admissible as a statement of intention or plan under Rule 803(3).

GX50 (07/23/18). This is a call between McClain and Madigan, the men make plans to go to Madigan's law firm and then to dinner together. It is admissible as a statement of intention or plan under Rule 803(3).

GX69 (11/26/18). In this call, McClain tells Cousineau he is going to meet with Mapes, which is a statement of intention or plan.

GX76 (02/06/19)     McClain tells Madigan's son that he is going to have lunch with Mapes, which is a statement of intention or plan.

GX85 & GX 86 (3/25/19). These two back-to-back calls are an example of Madigan using McClain's phone to call his new Chief of Staff to. The substance of the call is not relevant, but rather the fact that Madigan was using McClain's phone to contact his staff.

### b. Calls between McClain and Mapes' Family

GX24 (6/10/18). This is a call between McClain and Mapes' son, just four days after Mapes' resignation. Mapes' son expresses anger about Mapes' resignation, and describes Mapes and McClain as the people who made things tick for Madigan.

McClain says he's going to see Mapes on Tuesday. This call is not admissible for its truth but to show that McClain is so close to Mapes and his family that he has deeply personal calls with Mapes' son. Mapes' son's description as Mapes and McClain as the people who made things tick is not offered to show that they did, in fact, make things tick in Speaker's orbit, but to show that even Mapes' son had come to the understanding that McClain and Mapes were not only good friends but also important players in Madigan's operation. This is highly relevant to the perjury charges against Mapes because it shows that McClain's role was no secret from the Mapes family and the significant (and memorable) nature of their conversations.

GX32 (6/12/18). This is another call between McClain and Mapes' son, which again shows their close relationship. McClain is discussing his mother's death and that his first call was to Mapes. This call is not offered for its truth, but again to show the close relationship between McClain and the Mapes family.

GX55 (8/5/18). This is a call between McClain and Mapes' wife. Like the calls with Mapes' son, this shows the close connection between McClain and Mapes' family. They discuss pleasantries, like travel, exercise, Mapes' kids. At the end, Mapes' wife says she told her son that Mapes "needs to get back to work." None of the substance of the call is offered for its truth; it's all pleasantries, but it is relevant to show how McClain is intertwined with Mapes and his family Thus it is admissible.

### c. Calls between McClain and Other Individuals[20]

GX40 (6/27/18).[21] This is a call between McClain and a trade association representative whom McClain clearly has never met, as she introduces herself to him. McClain describes how Madigan had asked him to intercede with regard to legislation, and at the end says that "the Speaker relies on me, on a whole bunch of things." As discussed above, this is a call in which McClain shares with others that he does work for Madigan. This is admissible not for its truth. It doesn't matter whether McClain actually worked on this legislation for Madigan, but the call is admissible to show that McClain was not tight lipped and openly claimed to work for Madigan, whether or true or not. It should be admissible.

GX42 (6/28/18). This is a call between McClain and Mapes' replacement as executive director at DPI. McClain tells her, "I'm glad you're on board, and, uh, if I can ever do anything, all you gotta do is ask." They start discussing fundraising and the new director's transition. McClain also discusses McClain's and Mapes' fundraising program and how it worked. This call is not offered for its truth, but to show the disruption caused by Mapes' sudden departure and McClain's role in helping maintain continuity at DPI with fundraising and other matters by taking on some of Mapes' responsibilities.

GX47 (7/11/18). In this call, McClain is talking to a DPI staff member. McClain tells her that Mapes is coming over and that he plans to ask Mapes about a

---

[20] The government has disclosed the names of these individuals to defense counsel but has anonymized the speakers' names in this filing for privacy reasons.

[21] This same call was inadvertently also marked as GX 96.

confidential "list." This portion of the call is a statement of intention or plan, and therefore admissible. It is also admissible not for its truth, but to show that McClain was interacting with DPI staff in order to smooth the transition from Mapes' resignation.

GX48 (7/12/18). In this call, McClain tells a woman that Mapes and his wife are going to spent the weekend in Quincy, where McClain lives. This is admissible as a statement of intention or plan. It is relevant to show the nature and frequency of the communication between Mapes and McClain.

GX49 (7/12/18). In this call, McClain tells a former representative that he's getting his pool ready for Mapes, which is a statement of intention or plan.

GX52 (7/26/18). In this call, McClain tells a woman that he is going to have a beer with Mapes, which is admissible as a statement of intention or plan.

GX54 (7/26/18). In this call, McClain is again talking to a DPI staff member, and says he is driving back to Quincy after meeting Mapes in Springfield, which is admissible as a present sense impression. McClain then says he plans to meet with Mapes next week and the week after and that McClain asked him to work on things in the interim so that they can later discuss his plans, meaning his plans for employment. This portion of the call is admissible as a statement of intention or plan.

GX63 (11/08/18). In this call McClain tells Public Official B that he is acting as Madigan's agent and that Public Official B needs to leave the general assembly. The call won't be offered for its truth (that McClain was, in fact, acting as an agent), as there will be testimony from Public Official B on that topic. Instead, the call is an

63

example of McClain openly sharing that he was an agent and not keeping it a secret. The call is thus admissible not for its truth.

GX64 (11/08/08). This is a call where McClain tells Madigan that Public Official B will step down.

GX65 (11/13/18). In this call, McClain tells Madigan that Public Official B said he would "bow out." This sequence of calls are relevant to put into context McClain's conversations with Mapes about McClain's interactions with Public Official B.

GX67 (11/26/18). McClain tells a former representative that he is going to lunch with Mapes and later meeting with Madigan. This is admissible as a statement of intention or plan.

GX74. This is a conference call involving Madigan, McClain, and others (but not Mapes) regarding committee appointments. It is relevant to add context to the discussion Mapes and McClain had about Mapes' views on committee appointments—views that McClain then passes to Madigan.

GX82 (3/11/19). McClain tells a former representative that he is having lunch with Mapes. This is admissible as a statement of intention or plan.

GX88 (07/11/18). In this call, McClain tells something that Madigan "decided he can give me more assignments." Like the other calls in this category, the call is not offered for its truth but to show that McClain told many people about his assignments for Madigan.

GX89 (04/27/18). In this call, McClain tells something that Madigan thinks he has the capacity to do more assignments. Like the other calls in this category, it is not going to be admitted for its truth.

GX97 (11/30/18). In this call a representative asks McClain how to approach Madigan for a leadership position. McClain advises that the representative should hold off approaching Madigan until after veto session. This shows McClain giving advice on how to approach Madigan. The call will not be offered for its truth but to show McClain was asked for advice and that he gave advice.

## CONCLUSION

For the reasons stated above, the government respectfully asks the Court to deny defendant's motions *in limine*.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Julia K. Schwartz*
DIANE MacARTHUR
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300